BRADFORD BIGGER, Appellant Below, Plaintiff in Error, v. UNEMPLOYMENT COMPENSATION COMMISSION OF THE STATE OF DELAWARE, Appellee Below, Defendant in Error.

UNEMPLOYMENT COMPENSATION COMMISSION OF THE STATE OF DELAWARE, Appellee Below, Plaintiff in Error, v. BRADFORD BIGGER, Appellant Below, Defendant in Error.

(*June* 16, 1947.)

HARRINGTON, Ch., RICHARDS, C. J., SPEAKMAN, CAREY and PEARSON, J. J., sitting.

*Morris Cohen* (of Wilmington), *Joseph A. Padway* and *Robert A. Wilson* (both of Washington, D. C.), for Bradford Bigger, Appellant Below.

*Caleb R. Layton, 3d,* for Unemployment Compensation Commission, Appellee Below.

Supreme Court, No. 1 and No. 2, September Session, 1946.

CAREY, J., delivering the opinion of the Court:

The basic issue here involved is whether or not the plaintiff was properly denied Unemployment Compensation Benefits because of his refusal to accept the job at the duPont Deepwater Plant to which he was referred by the United States Employment Service.

The plaintiff relies upon two separate paragraphs of the Unemployment Compensation Law as justification for his refusal to accept the proffered job, to wit, Section 2(i) (2) (A) (B) and Section 5(c) (1) (2). These sections demand separate consideration.

The first mentioned section of the Act has to do with the definition of the word "Employment" and reads as follows:

"The term 'employment' shall include an individual's entire service, performed within or both within and without this State if—

"(A)   The service is localized in this State; or

"(B)   The service is not localized in any State but some of the service is performed in this state and (i) the base of operations, or, if there is no base of operations, then the place from which such service is directed or controlled, is in this State; or (ii) the base of operations or place from which such service is directed or controlled is not in any State in which some part of the service is performed but the individual's residence is in this State."

A subsequent clause of Section 2, viz.: (i) (4) (A) and (B), provides that service shall be deemed to be localized within a State if—(A) the service is performed entirely within such State; or (B) the service is performed both within and without such State, but the service performed without such State is incidental to the individual's service within the State, for example, is temporary or transitory in nature or consists of isolated transactions.

As we understand the plaintiff's contention on this point, work wholly without the State of Delaware is not covered by the Act; that is to say, a person engaged in employment entirely beyond the borders of the State cannot recover unemployment benefits under the Delaware Act. The inference is then drawn that this plaintiff was justified in refusing to accept this job because he would thereby have disqualified himself from receiving unemployment compensation benefits under the Act in the future. This argument assumes that all referrals must be to jobs which would be covered by the Delaware law in order to justify the denial of benefits to one who refuses such a referral.

The Court below refused to accept this contention. Although we agree with the result reached by the learned Judge, we are not in agreement with the reasons given by him for that ruling. The Court below apparently based its conclusion upon the belief that, since the services were to be directed and controlled from the Home Office of the duPont Company in Delaware and since the plaintiff resides here, the employment offered would be covered by the Delaware law. Analysis of the above quoted parts of Section 2 demonstrates the fallacy of this belief. Under (2) (A), an individual's service must be localized in this State. Nothing in (4) (A) or (B) justifies the statement that this particular work was localized in Delaware because, according to the record, all the work would have been performed at the Deepwater Plant in New Jersey and no part of it in Delaware. Likewise, subdivision (2) (B) does not apply because that subdivision requires some of the service to be performed in this State. Under neither definition would this particular employment fall within the scope of the Act. No claim has been made that any other section of the law would apply to this case.

Even though it be true that the employment offered to

this plaintiff did not come within the coverage of the law, we are nevertheless convinced that this Section alone did not justify his refusal to accept the work. Section 2 is a rather lengthy section defining numerous terms, one of which is the word "employment." In connection with the definition of that word, this same subdivision sets forth what employment is subject to the Act. Nothing in this whole section purports to show under what circumstances a covered employee may be deprived of his right to receive benefits. That subject is taken up in Section 5. There is nothing in this latter section to indicate that a person receiving benefits is justified in refusing a job for the reason we are now discussing. On the contrary, subsection (c) of Section 5 states that an individual shall be disqualified for benefits if he fails, without good cause, to apply for available, suitable work when so directed by the Employment Office or the Commission. Another subsection sets forth the grounds which would justify an individual in refusing to accept new work, none of which includes the one now under discussion.

It is highly significant that Section 5 uses the word "work" instead of the word "employment." If the Legislature had intended that all referrals by the Employment Office or the Commission be made to jobs covered by the Act, why was not the word "employment" used here? Obviously, it had no such intent. Even if the word "employment" had been used in subdivision (c), the Legislative intent might be questionable; clearly, where it failed to use a word which it had defined so carefully, we must assume that something different was intended. Courts will not assume that a legislative body has made a distinction of this nature without intending a difference. It is not required that a referral be made to a job covered by the Delaware Act and the fact that it is not so covered furnishes no justification for a refusal.

Section 5 of the Act sets forth the conditions under which an individual shall be disqualified for benefits. The only portions of that section which are now pertinent are as follows:

"Section 5. An individual shall be disqualified for benefits—

\* \* \* \* \* \*

"(c) If he has failed, without good cause, either to apply for available suitable work when so directed by the employment office or the Commission or to accept suitable work when offered him. Such disqualification shall begin with the week in which the refusal occurred and shall continue for the duration of the period of unemployment during which such refusal occurred.

"(1) In determining whether or not any work is suitable for an individual, the Commission shall consider the degree of risk involved to his health, safety, and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of the available work from his residence.

"(2) Notwithstanding any other provisions of this Act, no work shall be deemed suitable and benefits shall not be denied under this Act to any otherwise eligible individual for refusing to accept new work under any of the following conditions: (a) If the position offered is vacant due directly to a strike, lock-out, or other labor dispute; (b) If the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality; (c) If as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona-fide labor organization." 44 *Del. Laws*, c. 207, § 6.

It is charged by the plaintiff that the Deepwater job was vacant because of a labor dispute. No strike or lock-out existed. The Camden (N.J.) Local of the National Union, with which the plaintiff's union is affiliated, had refused to send painters to the plant because of the rate of pay. The hourly rate established by the Camden Local was $1.37½ as contrasted with $1.25 offered by the employer. Little, if anything, had happened between the union and the employer other than the mere refusal of the union to agree to the rate of pay. This was not a case where union men had been on the job and had left because of a dispute. It may, therefore, be seriously questioned if the position offered the plaintiff was "vacant due directly" to the disagreement which did exist.

However that may be, we fully agree with the finding of the Court below that the facts of this case do not constitute a labor dispute within the meaning of the Act. Where general words follow specific words in an enumeration describing the legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. 3 *Sutherland Statutory Construction* (3d *Ed.*) 395. The specific words used here are "strike" and "lock-out;" the general words are "other labor dispute." By mentioning the particular types of disputes, the Legislature intended the general term to include only disputes of a like nature. This construction is a typical example of the familiar ejusdem generis doctrine. It is unnecessary for us now to attempt to make an index or catalogue of disputes that would be included within the phrase used by the Legislature. It is necessary only to say that the disagreement or trouble which existed here between the Camden Local and the duPont Company was not the type of dispute contemplated by the Act. The phrase used implies an active, positive action on the part of either union or employer; it clearly

does not refer to a mere negative situation such as here existed, especially in the absence of any showing that there had ever been a contract between the union and the employer. We accordingly hold that the plaintiff's refusal to accept the job was not justified by the disagreement which existed in this case.

■■ It is contended by the plaintiff that his refusal to accept the job was justified under 5(c) (2) (b) because, he says, the wages, hours and other conditions of the work offered were substantially less favorable to him than those prevailing for similar work in the locality. The Court below denied this contention on the ground that the record clearly showed that the Commission had made a careful and exhaustive study of those questions and had concluded that the conditions of work were not substantially less favorable. We agree with the learned Judge on this point. There is ample evidence in the record to justify the finding made by the Commission. For example, it was shown that, even though the hourly wage scale was 7½c less than the plaintiff had been earning, his "take-home" weekly wage would have been greater because the new job would have provided 48 hours of work per week. It is true that the plaintiff would have been obliged to spend a total of something less than an hour and three-quarters travelling both ways between his home and the plant, which was longer than he had previously been accustomed to spend. On the other hand, the new job would have provided him with certain advantages (such as vacation with pay, sick benefits, steady work) which he had not previously enjoyed. No doubt the Commission took into consideration these advantages in comparison with the disadvantages in making its decision. Where there is evidence to support a finding of this nature, this Court ordinarily will not reverse. *LeTourneau* v. *Consolidated Fisheries Co.*, 4 *Terry* 540, 51 *A.* 2d 862.

In connection with this particular allegation, it has been pointed out that some of these conditions of employment were not in accordance with the union's rules or by-laws. In reply to that contention, it may be well to observe that the standard laid down by the sub-section now under consideration are the conditions "prevailing for similar work in the locality." Under this clause, we are not concerned with the union regulations; they will be discussed later herein.

The next contention of the plaintiff is probably the most important one, and it is upon this point that the cross-appeal was filed by the defendant. The Constitution of the plaintiff's union forbids a member from working on a non-union job under possible penalty of expulsion. He seeks to justify his refusal of the job offered on the ground that he would have been subject to this penalty if he had accepted the position. It is argued that this is equivalent to requiring him to "resign from" a "bona fide labor organization." In denying the validity of this argument, the Court below held (1) the term "condition of being employed" means the condition arising by reason of actual employment, or actual work on the job (citing *Chambers v. Owens-Ames-Kimball Co., Ohio App.*, 62 *N. E.* 2d 496) ; (2) the Union's rule prohibiting members from working on a non-union job is valid; (3) the words "resign from" are not synonymous with, but are directly opposite in meaning from, "expulsion." That conclusion, as we understand it, was based solely upon the fact that the union's rule prescribes expulsion of a member for disobedience rather than requiring him to resign. This reasoning seems to imply that the Union could, by changing a few words in its rules, alter an individual's right to receive unemployment compensation. Here again we must disagree with the reasoning of the learned Judge, although we agree with his ultimate ruling.

At the Deepwater plant, there was an independent union, but there was no regulation requiring an employee to join it, nor was there any rule of the employer requiring an individual to resign from any union of which he might be a member. The only authority which would have deprived this plaintiff of his membership was his union's own rule mentioned above.

There is no need, for present purposes, to question the reasonableness or the validity of the union rule. In relationships between and among members, or in dealings between union and employer, its validity may be conceded. We are not now, however, considering a dispute of that nature. The question here is: Did the Legislature intend the Commission and the Court to give effect to union regulations in determining whether an individual has forfeited his right to receive benefits?

It is necessary to keep in mind the basic purpose of the Law. This purpose is set forth in a preamble called "Declaration of State Public Policy." Economic instability due to unemployment is recognized as a serious menace to the welfare of the people, and involuntary unemployment is declared to be a matter of general concern requiring legislative action to protect the unemployed worker. The action taken to effectuate this purpose was the compulsory setting aside of an unemployment reserve to be used for the benefit of persons unemployed through no fault of their own.

In the body of the Act, the Legislature has defined with some care the standards for determining who is entitled to benefits from the reserve fund created. Nothing in the Act suggests that a union or a group of employers or any one else may add to, or subtract from, the standards laid down in the Act itself.

From what has been said, it is clear that the Legislature had no thought of strengthening or of weakening the power

of unions. Its purpose was to protect all workmen involuntarily unemployed. Membership in a union gives an individual no greater rights under the Act than he otherwise has. Likewise, a group of individuals cannot secure higher privileges merely by adopting a rule which binds themselves to a certain course of conduct. We cannot agree with a theory which would have the effect of substituting a union rule for a statutory requirement. If a man wants to benefit by the Act, he must comply with its provisions; his unemployment is not involuntary if he refuses a job without good cause; "good cause" means those reasons contained in the Act.

It is not difficult to understand why the law-making body included subsection 5(c) (2) (c). Without it, unscrupulous employers desiring to weaken and destroy labor organizations could make the Law a tool for that purpose. In its absence, they could force the job seeker to join a company union or to resign from his own union or to agree not to join any union. He would be obliged to meet those terms or lose his unemployment benefits. The clause was therefore inserted to protect the prospective employee against unfair conditions imposed by the employer. It was not designed to enforce demands of the employee or rules of his union.

The present argument is centered upon the definition of the words "condition of being employed." As we have indicated, we are of the opinion that the words refer to conditions imposed by the employer. This opinion is fortified by an analysis of the words in the clause. Three requirements or conditions are included within the ban: (1) joining a company union, (2) resigning from a union, (3) refraining from joining a union. Obviously, the first and third conditions could be imposed only by the employer. If the second condition were designed to be treated differently, the Legislature would have distinguished it from the

others in some manner. The formation of the sentence makes it clear that all three conditions are intended to be in the same category, that is, they relate to terms laid down by the employer.

As far as we are aware, the highest Courts of only two other states have passed upon this question, Ohio and Pennsylvania. Both of them have expressed views similar to those set forth above. The Ohio case of *Chambers v. Owens-Ames-Kimball Co., Ohio App.*, 62 *N. E.* 2d 496, upon which the Court below relied, was a lower Court case which has since been reversed by the Supreme Court of that State, even though the Ohio statute is somewhat broader than the Delaware Law; see 146 *Ohio St.* 559, 67 *N. E.* 2d 439, 165 *A. L. R.* 1373. The Pennsylvania case of *Barclay White Co. v. Unemployment Compensation Board of Review*, 356 *Pa.* 43, 50 A. 2d 336, decided after the opinion in our Superior Court was published, is to the same effect. Quoting from those opinions would be "carrying coal to New Castle."

Finally, it is contended that the Commission failed to take into consideration the health hazard involved at the Deepwater job, as required by Sec. 5(c) (1). The record discloses that the use of a spray gun was required at the plant a part of the time. It was shown, however, that employees using spray guns were provided with every modern safeguard against any hazard created by their use. No evidence was presented to indicate just how dangerous a spray gun is or to show that the hazard is not eliminated by the use of proper safeguards. Nevertheless, we are asked to take judicial notice that the hazard exists, as was done in *United States v. Bay Area*, (D. C.) 49 *F. Supp.* 733. The learned Judge below correctly declined to do this. There may be conditions under which spraying would be extremely hazardous; there may be other conditions under which it would not present any danger. Certainly, the danger from

it is not so definite and positive as to eliminate the necessity of proof. The question is for determination by the Commission just as is any other decision of fact. The Commission's finding in the present case was fully justified by the record; indeed, from the meager testimony on the point, it may be doubted if any other conclusion would have been justified.

The plaintiff refers to a rule of his local union reading as follows: "Members are strictly forbidden to operate spraying machines of any description at any branch of house painting, and dipping is also prohibited".

The plaintiff claims that this rule was adopted as a health measure and that it illustrates his contention that the hazard is so pronounced as to make it a matter for judicial notice. Actually, the rule speaks against, rather than for, the contention. Assuming that it was adopted as a health protection rather than a means of combating a labor saving device, why is the prohibition restricted to house painting? Is not a spray gun just as dangerous when used to paint an automobile as it is when used to paint a house? How can we say, as a matter of law, that spray gun painting is a health menace under all conditions when the union itself seems to imply that it is only dangerous in painting houses? The Court below was right in holding that the subject is not a proper one for the elimination of proof by the application of the judicial notice doctrine.

For the reasons assigned herein, the order of the Court below will be affirmed with costs upon the plaintiff. · · ·

The cross-appeal, however, will be dismissed, with costs upon the defendant. Its sole purpose was to review the reasoning in the opinion of the Court below with respect to one point; it did not seek a reversal or modification of the order itself. If a lower Court reaches a correct

result upon incorrect grounds, this Court does not bar the victor from pointing out the correct reasoning in an appeal by the loser. See *Polotsky v. Artisans Savings Bank*, 7 *W. W. Harr.* (37 *Del.*) 151, 188 *A.* 63, 107 *A. L. R.* 1458. The cross-appeal, therefore, brought nothing before us which was not brought up by the appeal itself.