356 P.2d 913

Frank E. NORMAN, Claimant-Appellant,

v.

**EMPLOYMENT SECURITY AGENCY,**
Respondent.

No. 8911.

Supreme Court of Idaho.

Nov. 4, 1960.

Rehearing Denied Nov. 29, 1960.

Johnson & Olson, Pocatello, for appellant.

Frank L. Benson, Atty. Gen., Thos. Y. Guilliam, Jedd Owens, Asst. Attys. Gen., John W. Gunn, Legal Counsel for Employment Security Agency, Boise, for respondent.

TAYLOR, Chief Justice.

Claimant (appellant) had been working as a journeyman plumber when his employment was terminated, September 18, 1959, by reason of completion of the job. September 23, 1959, he filed a claim for

benefits, effective September 20, 1959, under the employment security law, in the employment security office at Blackfoot, Idaho, where claimant resided. September 24, 1959, the agency gave him an introduction card referring him to the Math Behrend Plumbing and Heating company of Blackfoot, responsive to a request from that company for a plumber. Claimant went to the Behrend shop and there talked to either Mr. or Mrs. Behrend, or to both.

Behrends advised claimant that they desired to employ a journeyman plumber who could also estimate and prepare bids on plumbing jobs and also act as salesman in the shop when not engaged in plumbing work; explaining that it was Behrend's desire to be relieved from part of such managerial duties so that he at times could get away from the business. The employment would be year-round at a salary of $5,000 per annum, payable monthly, plus commissions on jobs and merchandise sold by claimant, and possible bonuses. Claimant advised Behrends that he was doubtful whether he could accept such employment because of the rules which he was required to adhere to as a member of the plumbers and pipe fitters union, and that he would first discuss the matter with the union representative.

After talking with the business manager of his local, claimant told Behrends that he could not accept the job because his union contract forbade him to accept employment as a journeyman plumber on any other basis than an hourly wage at the union scale, and that if he accepted the job on the terms offered he would jeopardize his union membership.

On his insurance interview September 29, 1959, claimant made and signed the following statement:

"I talked to Mrs. Behrend and she explained the salary ($5000/year & bonus on any jobs brought into shop & commissions on anything sold). I said I would talk it over with the union agent. The agent said the only way I could work there is to work at union scale wages. Mrs. Behrend and I are still trying to come to a compromise because I do not wish to lose my union standing but I also want to work."

October 5, 1959, a determination was entered denying benefits and claimant then sought a redetermination. His request therefor contained the following statement:

"If I had gone to work for Behrend Plumbing I would have endangered my union membership. I would have been fined and possibly lost my union book if I had stayed on the job. I don't want to lose my standing in the union. Union scale wages are $3.50 per hour—*not* $5000.00 per year. Behrend Plumbing has cancelled their working agreement with the union sometime

ago. Also at this time there is no opening at the shop, even though the position I was offered was *not* filled."

Upon claimant's request for redetermination, the agency by letter directed to the Behrend Plumbing company requested specific information as to the employment offered. The Behrends replied by letter, dated October 15, 1959:

"In answer to your letter of October 14, we did offer a job to Mr. Norman, guaranteeing $5000.00 per year paid monthly. We, also, offered a bonus if the year had been good and he had worked steady, and commissions on some of our larger items (such as: water sof*tn*ers, water heaters, etc.) or house jobs which he, himself, sold for the store.

"Mr. Norman was interested and promised to let us know, when he returned he said he would have to turn it down because the union did not approve.

"In answer to your questions: (1) We would not force Mr. Norman to work for us. He had the opportunity and turned it down. If someone else was truly interested in a *steady* job on a guaranteed basis we would certainly talk to them. (2) If Mr. Norman had accepted the job when he was first referred to us, he would still be working and there would be no lay off due to lack of work as we intended to absorb this ourselves. (3) We believe the answer to this is answered in # 2. But to clarify

a little further, we know there are always slow times in the construction work during the winter months and we would have expected Mr. Norman to have helped around the shop with odd jobs, to be on call for repair work, or to have been trying to sell above mentioned items. His pay would have been continued.

"Now to explain our decision in asking the local office not to send any more referrals to us at this time. We decided to wait until spring to make an offer to another person since we had manage to get through our heavy months without help. Since receiving your letter, we have reconsidered and will make the offer again this winter to anyone qualifying and willing to work on a guaranteed basis instead of hourly wage. The offer will be this: $5000.00 guaranteed per year paid monthly on the following scale; 5 winter months, November through March at $300.00 per month, the other 7 months April through October at $500.00 per month. The commissions and possible bonus remaining the same.

"Yours truly,

"Math Behrend Plumbing & Heating
"(Signed) Mrs. Math Behrend."

Upon the redetermination, October 21, 1959, the claim was again denied on the ground " * * * that the claimant's unemployment is due to his failure without good cause to apply for available, suitable work as directed, * * *."

On claimant's appeal, a hearing was had before the chief appeals examiner at Blackfoot December 3, 1959. Upon this hearing claimant appeared with his counsel. Claimant, Mr. Behrend, and one Gericke, business manager of the local union, testified as witnesses. Claimant testified in part as follows:

"Q. You understood that there was a job there? A. Well, there was a job opening. Yes.

"Q. Yes, and you were discussing the terms of employment with Mr. Behrend, is that right? A. Yes.

"Q. And did he at some point in this negotiation, say—well—he didn't have a job for you? A. No.

"Q. Well, did you at some point in the negotiation say that you wanted to discontinue negotiations? A. You have me in a technical spot there; but I don't think so. How about it Math?

"Q. What did you say? Let me ask you that way? What happened? I'm trying to see how the negotiations fell down. A. Well, it fell down because I told Mr. Behrend that I would have to check with the union as the statement was made before.

"Q. In other words, before negotiations were completed, as I understand from your testimony, you had told him, 'Well, at this point I have to check with my union.' A. Yes.

"Q. All right, and then did you check with your union? A. Yes.

"Q. And then what did you tell him or did you go back? A. I told him, no, when I went back. I can't take it.

"Q. In other words, the cessation of the negotiations you brought that about yourself then when you told him that, no, you could not take the job? A. Yes."

Mr. Behrend testified that the job for which he was seeking an employee involved some duties additional to the work of a journeyman plumber, which would be managerial in nature. Asked if he actually made an offer of such employment to Mr. Norman, he replied that he and Norman did not get far enough along in their negotiations to make an actual offer. He had known Norman for some years and was satisfied with his ability as a journeyman plumber, but wanted to inquire further into his experience and ability to fill the other requirements; that he had in mind a guaranteed salary of $5,000 per annum, plus commissions; that he had no objection to the prospective employee belonging to or continuing to be a member of a union; that in the spring of 1959 he, as an employer, had executed a contract with the union; that at the time of negotiations with claimant he was unaware of the fact that the terms offered claimant might constitute a breach of his union shop contract; that at that late

season of the year he did not have a job opening for a man who would do only the work of a journeyman plumber; and that the wage scale for nonunion plumbers in the Blackfoot area was $2.50 to $2.75 per hour.

Mr. Gericke, the business manager of the union local, testified that the union wage scale was $3.50 per hour; that if such an employee makes estimates for his employer he would be required to collect wages at the rate of pay of a foreman, $3.85 per hour; that a day shift is from 8:00 a. m. until 4:30 p. m., and double the rate of pay is required for overtime work; that a member of the union cannot accept employment on any other basis than the union scale hourly wages paid weekly; that a union plumber cannot bargain on his own initiative for any other terms or conditions of employment than those set out in the agreement bargained by the union; that if claimant had accepted the employment offered by Behrends he would have been dropped from membership by the union; that under the provisions of Behrends' union shop contract had Behrends employed claimant to do part time managerial duty, Behrends would have been required to employ another journeyman plumber to do at least 50% of the plumbing work performed by claimant.

Claimant had been a member of the union for two years. His total wages for 1958 aggregated $3,778.27. The evidence shows that plumbing work is seasonal and intermittent. After filing his claim, claimant was employed in the potato harvest at $1.25 per hour.

December 15, 1959, the chief appeals examiner affirmed the redetermination denying benefits. Claimant appealed to the industrial accident board. The board after a further hearing in which claimant testified, affirmed the decision of the appeals examiner and denied benefits. Claimant brought this appeal.

■ Claimant urges that the employment offered was not "suitable" work within the meaning of the Employment Security Law. He contends that the wages, hours and other conditions offered are substantially less favorable than those prevailing for similar work in the locality of the work offered. I.C. § 72–1366(i) (2). Claimant does not particularly emphasize this ground of his refusal to apply for the job offered. The evidence supports the conclusion that the guaranteed wage of $5,000 per year, plus bonuses and commissions, would net him as much or more for less arduous labor than what he would earn in intermittent employment as a journeyman plumber at the union scale.

■ Claimant relies most heavily upon the provisions of I.C. § 72–1366(i) (3), to

8

the effect that employment shall not be deemed suitable

"If, as a condition of being employed, the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization."

It is claimant's position that since his union would have expelled him from membership had he accepted the job proposed by Behrends, the employment offered was, for that reason, not suitable employment. The condition of unsuitability here involved was not one imposed by the prospective employer, but was imposed upon the claimant by his union. The statutory provision above quoted, has application only to conditions imposed by the prospective employer, and is not applicable to conditions imposed by the prospective employee or his labor union. As pointed out by counsel for the agency, the fallacy of claimant's position is demonstrated when the rule of suitability is applied to a nonunion claimant. If a nonunion plumber had failed to apply for or accept the employment offered there could be no doubt that he would be ineligible for benefits. If claimant's contention prevailed, the offered employment would be unsuitable for a union member, but suitable for a nonunion worker. So applied the statute would discriminate against nonunion workers. Such discrimination would render the statute of questionable constitutionality. This result was pointed out by the court in

Chambers v. Owens-Ames-Kimball Co., 146 Ohio St. 559, 67 N.E.2d 439, at page 443, 165 A.L.R. 1373, as follows:

"Under appellee's interpretation of the statute, an unemployed nonunion workman would be obliged to accept the same job which the appellee refused to accept and would be required to work without right to participate in the unemployment compensation benefits. On the other hand, the appellee could refuse to accept the same job at the same wages and by reason of such refusal qualify himself to receive benefits as an unemployed workman. In our view, such an interpretation of the statute would not permit it to operate in a constitutional manner. It would result in discrimination and injustice. The law must do justice. There can be no valid classification of persons based upon membership or nonmembership in a labor organization, which would operate to differentiate rights to receive benefits under the unemployment compensation statute."

In Barclay White Co. v. Unemployment Compensation Board of Review, 356 Pa. 43, 50 A.2d 336, the supreme court of Pennsylvania held that a member of a labor union was not involuntarily unemployed when he refused a referral to suitable work in an open shop. The court said:

" * * * However, when such union member is unemployed because

he refuses to accept a referral (at wages less than those established by the union, although not less than those prevailing for similar work in his community), rather than be fined, suspended or expelled from membership by the union, he is not *involuntarily* unemployed, but rather out of work through his own choosing. There is no compulsion on him to retain his membership in the union, and, therefore, the statute excludes him from its benefits when he refuses to accept 'suitable work.' * * * It would do great violence to the clear and unequivocal wording of the statute to hold that a labor or any other organization can control payments of unemployment benefits to its members by merely forbidding them to work at wages less than those set by it, or with certain persons or at certain places, or under certain conditions." 50 A.2d at page 341.

In Bigger v. Unemployment Compensation Commission, 4 Terry 553, 43 Del. 553, 53 A.2d 761, at page 766, the supreme court of Delaware said:

"In the body of the Act, the Legislature has defined with some care the standards for determining who is entitled to benefits from the reserve fund created. Nothing in the Act suggests that a union or a group of employers or any one else may add to, or sub-tract from the standards laid down in the Act itself.

"From what has been said, it is clear that the Legislature had no thought of strengthening or of weakening the power of unions. Its purpose was to protect all workmen involuntarily unemployed. Membership in a union gives an individual no greater rights under the Act than he otherwise has. Likewise, a group of individuals cannot secure higher privileges merely by adopting a rule which binds themselves to a certain course of conduct. We cannot agree with a theory which would have the effect of substituting a union rule for a statutory requirement. If a man wants to benefit by the Act, he must comply with its provisions; his unemployment is not involuntary if he refuses a job without good cause; 'good cause' means those reasons contained in the Act.

"It is not difficult to understand why the law-making body included subsection 5(c) (2) (c). Without it, unscrupulous employers desiring to weaken and destroy labor organizations could make the Law a tool for that purpose. In its absence, they could force the job seeker to join a company union or to resign from his own union or to agree not to join any union. He would be obliged to meet those terms or lose his unemployment

benefits. The clause was therefore inserted to protect the prospective employee against unfair conditions imposed by the employer. It was not designed to enforce demands of the employee or rules of his union."

Other cases holding to the same effect are Elnit v. Unemployment Comp. Bd. of Rev., 168 Pa.Super. 158, 77 A.2d 668; Glen Alden Coal Co. v. Unemployment Comp. Bd. of Rev., 169 Pa.Super. 124, 82 A.2d 74; Mills v. Mississippi Emp. Sec. Comm., 228 Miss. 789, 89 So.2d 727, 56 A.L.R.2d 1010.

In holding claimant ineligible the appeals examiner appropriately reasoned that

"To permit work to be deemed unsuitable because of the provisions of such a [union] contract would be to allow unions and employers to dictate the conditions under which the Agency would or would not pay benefits. The matter of a union-negotiated contract is one of concern to the employer and the union. No union contracts can amend the law of the State of Idaho so as to grant its members privileges not contemplated by the law."

■ Claimant urges error on the part of the appeals examiner in supporting his decision by reference to, and quotation from, the letter of October 15, 1959, addressed to the employment security agency and signed by Mrs. Behrend, on the ground that the letter was not introduced in evidence before the appeals examiner. He urges the rule that the decision of an administrative tribunal cannot be based upon evidence aliunde the record, and cites among other cases, Application of Citizens Utilities Co. (Application of Shoshone Natural Gas Co.), 82 Idaho 208, 351 P.2d 487.

The action of the appeals examiner did not prejudice the claimant because he was afforded an opportunity at the hearing before the industrial accident board to meet the statements made in the exhibit. At the opening of the hearing before the board claimant's counsel and counsel for the agency entered into a stipulation that the transcript of the testimony before the appeals examiner be admitted before the board as an exhibit, and the remainder of the record of the agency be admitted in evidence as another exhibit. The letter, a part of that record, was at that time known to counsel for claimant. At the close of the hearing before the board he advised the board that his reason for producing the claimant as a witness and eliciting his further testimony before the board, was because of the statements made by Mrs. Behrend.

■ The burden of proving eligibility was upon the claimant. Roby v. Potlatch Forests, Inc., 74 Idaho 404, 263 P.2d 553;

Claim of Sapp, 75 Idaho 65, 266 P.2d 1027; Wolfgram v. Emp. Sec. Agcy., 75 Idaho 389, 272 P.2d 699; Wolfgram v. Emp. Sec. Agcy., 77 Idaho 298, 291 P.2d 279; Turner v. Boise Lodge No. 310, etc., 77 Idaho 465, 295 P.2d 256; Hatch v. Emp. Sec. Agcy., 79 Idaho 246, 313 P.2d 1067, 65 A.L.R.2d 1174, Annotation 1182; In re Walker's Claim, 80 Idaho 420, 332 P.2d 199.

If claimant desired to refute statements made by Mrs. Behrend or to show that no job was actually offered, he could have produced Mr. and Mrs. Behrend as witnesses before the board, I.C. § 72–1368(g). He was not denied an opportunity to test or refute the evidence upon which the examiner and the board in part relied in holding him ineligible.

■ Lastly, claimant contends that there was no actual offer of employment made. He cites the evidence that Behrends had asked the local office not to send any more referrals until spring because of the slack winter season, and the testimony of Mr. Behrend that he had no intention of violating his union shop contract and did not have employment for a managerial assistant in addition to a journeyman plumber. This contention is refuted to an extent by the letter signed by Mrs. Behrend. However, the finding of ineligibility in this case is not based upon a refusal to "accept" an offer of suitable employment, but upon appellant's failure to "apply" for available, suitable work. I.C. § 72–1366 in part provides that one of the conditions of eligibility is that

"(h) His unemployment is not due to his failure without good cause to apply for available suitable work as directed by a representative of the director or to accept suitable work when offered to him * * *."

The evidence shows that claimant himself broke off negotiations with the Behrends before they could determine his acceptability for the job they were offering, and that he never did make application to them for employment. On this point the board found:

"While claimant did not receive a firm offer of employment from Behrend, it was because claimant never permitted the discussion to reach that point. He summarily broke off negotiations and discussion. He refused to consider the proffered employment, not because the employment itself was unsuitable, but because his union's business agent advised him that if he took the job he would jeopardise his union standing. The business agent's interpretation of the union-negotiated contract is apparently more rigid than the contract itself. With proper keeping of time on the various categories of work contemplated, it would be pos-

sible to comply with the contract and at the same time permit the worker to receive the employer's offer of a minimum annual guaranteed income."

This finding is supported by the evidence and justifies the board's conclusion of ineligibility.

Order affirmed.

No costs allowed. I.C. § 72–1375(b).

SMITH, KNUDSON, McQUADE and McFADDEN, JJ., concur.