**361 P.2d 795**

In The Matter of Raymond ANKRUM et al., Claimants-Appellants,

v.

**EMPLOYMENT SECURITY AGENCY,** Defendant-Respondent.

No. 8891.

Supreme Court of Idaho.

May 9, 1961.

Carver, McClenahan & Greenfield, Boise, for appellant.

John W. Gunn, Boise, Idaho, for respondent.

Richards, Haga & Eberle and Eli A. Weston, Boise, amicus curiae.

SMITH, Justice.

Appellant Raymond Ankrum, and others, are referred to as Claimants; respondent Employment Security Agency, as the agency; the Industrial Accident Board, as the board, and the employer group, sometimes as the operators.

This is an appeal from an order of the board affirming the agency's denial of unemployment compensation benefits to Claimants. The appeal is designed to test whether the board erroneously based its ruling of ineligibility on the ground that Claimants, through their representatives, participated, aided or were directly interested in a labor dispute which caused the stoppage of work. I.C. § 72–1366(j) (1) and (2).

Claimants are members of local unions of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, commonly known as the Teamsters Unions, which are affiliated in Joint Councils in the area of the eleven western states.

Five of those local unions, 483 Boise; 983 Pocatello; 222 Salt Lake City; 976 Ogden; and 307 Casper, are affiliated in Joint Council 67 with headquarters in Salt Lake City.

There are 103 local unions in the eleven western states, each belonging to one of the nine or ten Joint Councils in that area.

The Joint Councils are combined in the Western Conference of Teamsters, which acts through divisions and committees; among the latter is the Over-the-Road Negotiating Committee created in 1957 by the General Hauling Division of that Conference, which committee consists of nine members and nine alternates.

The employers herein, trucking companies, ten in number, interstate motor freight carriers in the area, having terminal facilities in Idaho, are members of Intermountain Operators' League. In the eleven western states there are seven or more similar employer leagues, which in January 1956 combined in the formation of a negotiating committee known as the Eleven Western States Policy Committee. During early 1958 the employers constituted this committee to consist of nine members and nine alternates, to negotiate with the similarly constituted Teamsters Over-the-Road Negotiating Committee.

Claimants, employees, are of two groups, i. e., (1) Line Drivers, or over-the-road, or highway drivers, which include sleeper-cab operators, and (2) Terminal Employees, which include local pickup and delivery drivers, warehouse maintenance, garage and service personnel, and clerical workers.

Claimants became unemployed during August 1958 when the Terminal Employees, represented by Joint Council 38 in the

general area of the Sacramento Valley, California, struck on August 11, 1958, against employer members of the California Trucking Association because of a wage dispute which, the board found, arose upon refusal of the local delivery drivers to accept the terms of a proposed Master Agreement of May 27, 1958, theretofore negotiated by the union-employer representatives in the Eleven Western States Conference. Operators in the eleven western states acting collectively elected to consider the strike as a "whipsaw" tactic (referring to a union tactic of progressively striking one employer at a time), and as a strike against all operators in the Western Conference; and in accordance with their prior ultimatum to the unions, should a strike be called, all the operators in the eleven western states instituted a lockout and shut down their operations with the resulting unemployment of Claimants.

In the intricate and complicated bargaining negotiations, detailed in the evidence, the various employer and union groups, including the International Brotherhood of Teamsters, participated at various times from February to October, inclusive, 1958, at various places, including Salt Lake City, San Francisco, Stockton, Phoenix, Seattle and Washington, D. C.

Four of appellants' assignments assert error of the board in ruling:

1. "The unemployment of claimants existed because of a labor dispute."

2. "The labor dispute covered the entire labor area of the Eleven Western States, and was between all employer associations in the long line truck industry and all local councils, with their inclusive local Unions, in the Western Conference of the Teamsters' Union."

3. "In the negotiations to settle the dispute all individual employers and all local unions were involved and all were bound by the results of the restrictions."

4. "All members of the local unions in the Western Conference of Teamsters who are employees of the operators herein involved participated, through their representatives in the dispute and all had a direct interest in its outcome."

Appellants' fifth assignment questions the sufficiency of the evidence to sustain those rulings, and to sustain the order denying benefits.

I.C. § 72–1366(j) (1) and (2), applicable to this proceeding, reads:

"(j) A benefit claimant shall not be eligible to receive benefits for any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute; provided, that this subsection shall not apply if it is shown that—

"(1) He is not participating, financing, aiding, abetting, or directly

interested in the labor dispute which caused the stoppage of work; and

"(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or directly interested in the dispute."

Certain basic elements of ineligibility set forth in subsection (j) above are undisputed, i. e., that a labor dispute existed; that Claimants' unemployment was due to a stoppage of work because of the labor dispute, and that Claimants constituted classes of workers which, immediately before the stoppage, were employed at the various employers' premises where the stoppage occurred.

The ultimate issue is included within the purview of the provisos (1) and (2) above, i. e., whether Claimants, or the classes of workers which they constituted, participated in or were directly interested in the labor dispute. The answer is dependent upon whether the labor dispute which resulted in the stoppage of work in Idaho was a specific local strike restricted in scope to one area in California, or a general dispute resulting therefrom throughout the eleven western states.

Appellants' fifth assignment, questioning the sufficiency of the evidence to sustain the board's rulings, and its order denying benefits, requires a brief review of the record in order to ascertain whether there is evidence of a substantial nature to sustain the board's order of denial.

Prior to 1955 within the area of Joint Council 67, bargaining between the trucking interests and their employees had been conducted between Intermountain Operators' League and Teamsters Joint Council 67. The latest Master Contract, dated May 1, 1955, was arrived at by such bargaining process for the ensuing 3-year period, to expire April 30, 1958, including supplements, covering all the classes of Line Drivers and Terminal Employees hereinbefore mentioned.

During February 1958 the various locals affiliated in Joint Council 67, being desirous of terminating their contracts, i. e., the Master Contract expiring April 30, 1958, and supplements covering all the classes of employees, so notified the Intermountain Operators' League.

The scope of the bargaining, i. e., on a local joint council basis on the part of the employees, and a corresponding local basis on the part of the employers, was changed in late 1957 to negotiations on an eleven western states basis; particularly by the union-created Over-the-Road Negotiating Committee of the Western Conference of Teamsters. This newly created union committee, during February 1958 initiated nego-

tiations for a new Master Contract to replace the one due to expire April 30, 1958.

At the initial meeting of the Over-the-Road Negotiating Committee with the Operators' Western Policy Committee during February 1958, in San Francisco, the union committee submitted a form of power of attorney with a list of local unions who had executed it, authorizing such committee to negotiate on behalf of Line Drivers. The operators agreed to joint negotiations, the Master Contract to be negotiated first, and the supplemental contracts to be bound by the Master. Among union negotiators present were representatives of Joint Council 67 (covering portions of Idaho, Utah and Wyoming), and Joint Council 38 (covering the Sacramento Valley area).

On March 5th and March 20th, the Intermountain Operators' League, in response to requests by the union for an eleven western states negotiation on terminal employees contracts, informed the union of its desire to continue negotiations for terminal employees on a local basis as had been done in the past. Negotiations during April failed to solve that aspect of negotiating. May 1st, when the union again asked that negotiations for terminal employees be conducted on an eleven western states basis, the operators requested that the Western Conference of Teamsters be identified in the contract, to which the union agreed. Thereupon, the operators agreed to negotiate for terminal employees at the same time as for line drivers, and negotiations then proceeded during May.

The evidence indicates that negotiations for terminal employees were conducted on an eleven western states basis thereafter; although there is opposing testimony to the effect that there was no connection between the negotiations for terminal employees of Joint Council 38 on an eleven western states basis, even though such negotiations were conducted at the same time and place, and by the same union personnel, as will be hereinafter indicated.

Continued negotiations resulted in a "Memorandum of Agreement—May 27, 1958," approved by officers of the respective committees, for submission to the employers and to the local unions for approval.

Paragraph 1a. and b. of the Memorandum of Agreement covered proposed increases in long and short line rates of pay (of Line Drivers) in all existing contracts.

Paragraph 2 of such Memorandum proposed increases in all other rates of pay (of Terminal Employees) than those referred to in Paragraph 1.a and 1.b, "including but not restricted to pickup and delivery, dock, clerical, garage employees, etc."

Paragraph 6 of such Memorandum proposed: "Utah-Idaho pickup and delivery to convert to 40-hour week equitably."

The terms of the proposed Memorandum Agreement of May 27, 1958, were approved

by the operators, but some local unions in Washington, a part of Oregon, Colorado, and the Valley area in California rejected it.

The negotiators then met during the latter part of June in Seattle, at which time the union representatives proposed additional concessions, but the operators refused to negotiate further, maintaining that an agreement had been reached by bargaining, which they were willing to execute. The operators, in reaffirming their position, notified the union representatives that "a strike against any one industry member in the eleven western states is a strike against all."

A committee from Joint Council 38 initially attempted local negotiations with representatives of California Trucking Association on behalf of local pickup and delivery, dock men, garage employees and clerical workers—the terminal employees. These negotiations commenced April 17, 1958, in Stockton, and continued to San Francisco, where the Eleven Western States Conference was in progress, at which time both union and employer representatives submitted proposals. The next meeting, June 3rd at Stockton, the "Memorandum Agreement—May 27, 1958," worked out by the Eleven Western States Conference, at which Mr. Shearin, president of Joint Council 38, was one of the negotiators, was presented for supplemental negoti-

ations, but was rejected. At the next session, June 19th, at Stockton, the clerical workers of unions affiliated in Joint Council 38, accepted the terms of such Memorandum Agreement, but the other classes of terminal employees rejected it; thereupon the operators were advised that Joint Council 38 and its affiliated locals had authorized a strike. At an August 1st meeting at Stockton representatives of Joint Council 38 submitted additional proposals which the operators in the California Trucking Association rejected. Thereafter, on August 6th, Joint Council 38 fixed a strike deadline as of August 11th, at which time all classes of terminal employees, excepting clerical, did strike. The non-striking Line Drivers and clerical workers, shortly after the strike, were locked out by the employers.

In accordance with their previously announced ultimatum that a strike against any operator in the eleven western states would be considered a strike against all, the operators in the eleven western states instituted a "lock out" and within a few days completed the shutdown of their operations. In the area of Joint Council 67 work stoppage became complete within two or three days after the strike began on August 11th.

The record indicates that the locals of Joint Council 38, to achieve parity with the Oakland area, undertook to bargain separately with the California Trucking Association on behalf of terminal employees, and

that failure in that regard resulted in the strike threat. On the other hand, the record also indicates that the dispute in the Sacramento Valley area grew out of the refusal by Joint Council 38 to accept the proposed terms of the "Memorandum Agreement—May 27, 1958," rather than because of the effort to achieve parity with the Oakland area.

The problems of Joint Council 38, as well as all other Joint Councils, including Joint Council 67, were not settled until continued negotiations were had during a period after the strike of August 11, 1958, with meetings held at San Diego, San Francisco and Washington, D. C. As a result of those negotiations, and settlement of the strike on September 18th, an entirely new Master Agreement covering the eleven western states was drafted, with supplements covering the various classes of employees, under the auspices of the International Brotherhood of Teamsters, representing the unions. The terms of such final settlement were more advantageous to the workers than the previous proposals of May 27, 1958. The final contracts, to which locals of Joint Council 67 were parties, were completed and executed on October, 24, 1958.

The local master agreement and all local supplemental agreements embody the terms of the Master Agreement executed in Washington, D. C., which cover the entire area of the eleven western states.

Certain testimony indicates that authorized union negotiations on an eleven western states basis related only to line drivers. The record also shows that the scope of the negotiations was enlarged to include all terminal employees, and that negotiations on that basis continued until an agreement was reached as to all classes of union workers, both line drivers and terminal employees. Moreover, Claimants do not challenge the board's finding which resolved this conflict in the evidence, that the bargaining as to all classes of union employees was effected on the eleven western states basis.

We shall briefly refer to testimony which supports the findings of the board.

Mr. Baldwin, an officer of Teamsters Local 483 Boise, testified in effect that the local unions affiliated in Joint Council 67 were parties to the new Master Agreement covering the eleven western states, which replaced the one which expired April 30, 1958. Mr. Baldwin stated:

"Q. To your knowledge is there a master agreement in existence between the local unions that you represent, Joint Council 67, and the 11 western states?

\*        \*        \*        \*        \*        \*

"A.  \*  \*  \*  I signed it personally last Friday [October 24, 1958], in Salt Lake City.

"Q. And that contract supercedes any local administrative contract you might sign with the Intermountain Operators League, isn't that true? A. Well, it's only the master. The supplements are a part of the master. The master * * * would supercede the previous master that was entered into and expired * * * in '55 through this year."

Mr. Callister, testifying for the employers, stated that the unions were desirous of having an 11 western states contract, in the interests of uniformity. He then related that the former Master Agreement, together with the supplements, terminated April 30, 1958, by due notice in the premises given by union representatives; that the termination affected line drivers as well as terminal employees; also affected "all employees in the unit * * * appropriate unit for the purpose of collective bargaining. * * * The master covers the general terms and conditions and the supplement goes to the various particular groups. But they're one group for the purposes of collective bargaining. * * * This last time we changed to 11 western states unit for the purposes of collective bargaining, which included all the employers in the 11 western states and all the unions * * *. In other words, we considered one unit for the purpose of collective bargaining. * * * we have joined the 11 western states group."

Mr. Callister further stated, during the spring of 1958 at the meetings in California of the union-employer groups, that the operators desired to bargain only as to line drivers on an 11 western states basis, as heretofore indicated by the union representatives, and that he was opposed to bargaining for other classes than line drivers on an 11 western states basis. He was then asked if the operators bargained for classes of employees other than line drivers on the 11 western states basis; he replied:

"A. We certainly did. * * * everything came into the group. * * we found we couldn't settle the agreement only on a line drivers deal, but they [the unions] bargained for all, * * * In other words, they took in, not only line drivers, but we agreed * * * to bargain for all job classifications in the unit * * *. We found ourselves on May 27, 1958, in bargaining not only for line drivers on 11 western states group but also for pickup and delivery, garage employees and all groups, sleeper-cab, et cetera, that we had previously bargained for in Utah and Idaho."

Mr. Callister further testified that the bargaining for the final Master Agreement after September 7, 1958, in Washington, D. C., "was done on 11 western states basis."

Mr. Kiser, union representative of Joint Council 38, stated that in bargaining, "our

representatives sometimes * * * have to wear more than one hat." The effect of changing of hats was well illustrated by the testimony of the union representative Mr. Baldwin, when asked if the employees of Oakland were a part of the eleven western states agreement, replied:

"A. Well, that's pretty hard to answer. * * * The unions will tell us one day they're part of it and the next they weren't."

Appellants' contention that the original scope of the bargaining process was not broadened to include terminal employees, including office workers, is refuted not only by the foregoing testimony, but by the wage settlement proposal of May 27, 1958, which shows that the bargaining included all classes of terminal employees, thereby supporting the board's finding that the scope of the bargaining was on an industry-wide basis, broadened to include all classes of workers.

The final Master Agreement, executed during October 1958, which ultimately resulted from negotiations in Washington, D. C., additionally and directly benefited the various classes of workers, all members of the Teamsters union, by increases in the final contract over that proposed May 27, 1958, the later agreement having been accomplished by bargaining on an industry-wide basis. Appearing for the operators, Mr. Brooks' testimony in such regard is undisputed. His testimony appears:

"Q. Now were they [the workers belonging to the Teamsters union] di-rectly interested in its [the latest contract] outcome?

\*       \*       \*       \*       \*       \*

"A. Oh, I think they stood to benefit * * * and they did benefit. * * If it's in their pay check, that is pretty direct."

He also referred to the equitable conversion to the shorter 40-hour week basis without a cut in pay of the Utah-Idaho pickup and delivery employees, stating that the monetary aspect of such conversion was settled at the Washington, D. C., conference. This again is indicative of the employee interest in the direct monetary benefit aspect arising out of the labor dispute.

The evidence as resolved by the board thus substantially supports its findings, that the labor dispute, causing stoppage of work in Idaho, was the result of a strike in the area of the Sacramento Valley in California, of general proportions growing out of a failure to arrive at wage rates by bargaining processes on the eleven western states basis; also, that the continued negotiations which extended to Washington, D. C., ultimately resulted in the final Master Agreement executed during October 1958, whereby Claimants directly benefited by increases in rates of wage pay over the proposals of May 27, 1958, obtained after the strike occurred and reflected in such final Master Agreement and the supplements.

We are cognizant of Claimants' contention that the recent Utah case of Team-

sters, Chauffeurs, etc. v. Board of Review, etc., 10 Utah 2d 63, 348 P.2d 558, 563, should control the outcome of the case at bar, contending that the Utah case is based upon the identical ground work involved herein.

While both cases appear to have grown out of the same transactions, the Utah statute, U.C.A.1953, § 35–4–5, is different from the Idaho statute, I.C. § 72–1366(j) (1) (2). The Utah statute disqualifies a claimant for benefits if "his unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or group of workers at the factory or establishment at which he is or was last employed." Chief Justice Crockett, in the Utah case, observed that the claimants, though willing to work, were locked out by their employers, which established prima facie that they were involuntarily unemployed which entitled them to unemployment benefits unless some reason appeared to disqualify them. He then remarked that "such a result would not eventuate unless the evidence demonstrated that these Utah employees were tied together with Joint Council 38 so that the strike of the Sacramento union was part of a plan of concerted action against all * * * employers." The holding of the Utah court then follows, that *the record before that court* "is devoid of any substantial basis upon which such a conclusion could rest."

■ On the other hand, Idaho's statute, I.C. § 72–1366(j) (1) (2), in effect denies benefit qualification if the stoppage of work exists because of a labor dispute, provided, the worker or the class to which he belongs participates or is directly interested in the labor dispute which causes the work stoppage. As heretofore shown, such statutory mandates govern the findings of the Industrial Accident Board, which findings are supported by substantial, though conflicting, evidence; therefore, Claimants' assignments are without merit.

■ The burden is upon a claimant for unemployment compensation benefits to establish his eligibility for such benefits, whenever his claim therefor is questioned. Talley v. Unemployment Compensation Division of Industrial Accident Board, 63 Idaho 644, 124 P.2d 784; Claim of Sapp, 75 Idaho 65, 266 P.2d 1027; Doran v. Employment Security Agency, 75 Idaho 94, 267 P.2d 628; Turner v. Boise Lodge No. 310, etc., 77 Idaho 465, 295 P.2d 256; Watts v. Employment Security Agency, 80 Idaho 529, 335 P.2d 533; Bean v. Employment Security Agency, 81 Idaho 551, 347 P.2d 339; Cahoon v. Employment Security Agency, 1960, 82 Idaho 224, 351 P.2d 477; Norman v. Employment Security Agency, Idaho 1960, 356 P.2d 913.

■ The findings of fact of the Industrial Accident Board in a proceeding instituted under the Employment Security Law, when supported by substantial, though conflicting, evidence, will not be disturbed on appeal. Blue Bell Co. v. Employment

Security Agency, 75 Idaho 279, 270 P.2d 1054; Ellis v. Employment Security Agency, ante, p. 95, 358 P.2d 396.

The order of the Industrial Accident Board denying benefits is affirmed.

No costs allowed.

TAYLOR, C. J., and KNUDSON, McQUADE and McFADDEN, JJ., concur.