255 P.2d 1049

**MANDES v. EMPLOYMENT SEC. AGENCY.**

No. 7935.

Supreme Court of Idaho.

April 7, 1953.

Keeton and Taylor, JJ., dissented.

W. B. Bowler, Boise, William L. Tuson, Kellogg, William A. Babcock, Jr., Portland, Or., for appellant.

Robert E. Smylie, Atty. Gen., and John W. Gunn, Asst. Atty. Gen., for respondent.

GIVENS, Justice.

Appellant was discharged by the Sidney Mining Company, his then employer, September 29, 1950, for reputed refusal to continue the operation of an auxiliary hoist near the internal end of a 1600-foot tunnel servicing upper levels.

Initial claim was filed October 10, 1950, and renewed July 3, 1951. The claim was first denied by the Claims Examiner and

after a hearing October 18, 1951, before Appeals Examiner, W. Clyde Williams, was denied by him November 1, 1951, which was on appeal affirmed by the Industrial Accident Board August 1, 1952, with the present consequent appeal therefrom.

■ The Employment Security Agency urges findings of the Industrial Accident Board, the administrative agency implementing the Employment Security law, will not be disturbed on appeal unless there is such an entire absence of evidence as renders the findings of the Board unreasonable. However, when the Board does not hear and see the witnesses, the findings of such tribunal are not binding on this Court. Phipps v. Boise Street Car Co., 61 Idaho 740, at page 747, 107 P.2d 148.

Section 72-1366(f) I.C., provides as one of the personal eligibility conditions for securing unemployment compensation that—

"His unemployment is not due to the fact * * * or that he was discharged for misconduct in connection with his employment; * * *."

The Appeals Examiner, in his carefully prepared decision, quotes from 48 Am.Jur. 541-542, Section 38, the definition of Misconduct Precluding Payment of Unemployment Insurance, thus:

"Misconduct within the meaning of an unemployment compensation act excluding from its benefits an employee discharged for misconduct must be an act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer. * * *."

This conception of misconduct with relation to the unemployment compensation statute seems to be supported by authorities and consonant with the dictionary definitions insofar as they are applicable. Merkle v. Review Board of Indiana Employment Security Division, 120 Ind.App. 108, 90 N.E. 2d 524; 146 A.L.R. 243; 58 C.J.S., Misconduct, page 817.

Appellant for many years had worked as a miner in various capacities and it is conceded he was suffering from silicosis, Grade II, at the time of his discharge and had been advised it would be unwise for him to continue underground employment. Therefore, he had not been immediately required to work as a miner underground, but had been given employment above ground outside the mine demolishing obsolete buildings, and with the consent and acquiescence of the employer, was living in one of the abandoned buildings and thus in effect was in the nature of a watchman or caretaker, though not employed as such.

His various duties and activities immediately prior to the day of his discharge, and to some extent coincidental therewith, were thus summarized by Malcolm Brown, General Superintendent of the Company:

"In other words he probably had two or three primary duties. One was the starting of this pump and one was the security watch and then to complete his work or to keep him busy during the day he worked on the dismantling of the buildings, etc."

The attendant at the particular hoist involved had suffered burns shortly prior to appellant's discharge, which necessitated someone else operating the hoist. Mr. Ed Cole, the Company foreman, testified in substance that he told appellant to temporarily operate this hoist until the regular man recovered from his injury and returned to work; that on the day in question, either during the latter part of the lunch hour or immediately after the lunch period, Cole found appellant absent from the hoist and when he requested appellant to return to the hoist and continue its operation, appellant refused to do so without giving any reason; whereupon Cole, after futile attempts to persuade appellant to continue at the hoist, called in the shifter to take over the operation of the hoist the remainder of the day and discharged appellant, telling him to get his time in the morning.

While appellant's testimony is not altogether clear, it indicates uncertainty on his part as to whether he was to operate the hoist continuously and regularly throughout each day, or merely to take the two or four men to their work on the upper levels, above where the hoist mechanism was situated and where the operator had to be in operating the hoist. Appellant testified that material was taken up not by him, but by the shifter. He also testified he told Cole he was not supposed to work underground, although he did not specifically state he told Cole of his silicotic condition.

A letter to appellant under date of October 15, 1951, from Dr. H. E. Bonebrake, stated in part: "After your hospitalization in 1945, you were told that it would be unwise for you to continue underground employment." Dr. Robert E. Staley in a letter dated the next day, stated with regard to appellant: "To Whom It May Concern X-ray films taken 9/30/50 reveal Silicosis Grade II. He has been refused underground employment."

Appellant testified respondent employer knew of his silicotic condition. Mr. Brown stated, with regard to whether he had any knowledge of any written record of appellant's condition, as follows:

"A. * * * If there was a slip from the doctor, I don't recall it, however, it would only be fair to state that there might have been and been lost because this file system we really only got going very carefully with that along in 1946 so its possible there might have been some such thing and it was lost.

"Q. But you haven't any recollection, Mr. Brown, have you, of ever having any information that he was not to work underground?

"A. No, I have no recollection of such a thing."

Elsewhere Brown stated with regard to appellant's physical condition in 1945 and his inability to work underground:

"A. * * * I checked up and we don't have any pre-employment physical. We were quite sloppy about that back at that time."

It is apparent, however, that the employer acted upon some such information or some understanding, because appellant was not employed underground after 1945 and was employed above ground and the employer insists that appellant's operation of the hoist was only of a temporary nature. In other words, he would only have to be underground at the hoist for a short period of time.

There are statutes which bar recovery of unemployment compensation after an employee had been discharged for *wilful* misconduct. While the word "wilful" does not appear in our statutes, the term "misconduct" as defined in connection with the unemployment compensation statute connotes intentional action on the part of the employee and the only authorities called to our attention and which we have been able to find upon the matter, indicate that mere absenteeism, unless chronic and continued, does not constitute wilful misconduct. Merkle v. Review Board of Indiana Employment Security Division, supra.

Appellant's evidence is persuasively pertinent wherein he testified with regard to the instructions given him by Mr. Brown, Mr. Cole and the shifter and the work he was doing and told to do, as follows:

"Q. Then on the day that you were discharged, September 29, did Mr. Cole ask you why you were not in at the hoist? A. Yeah.

"Q. What did you reply? A. I told him Mr. Brown told me to tear his roof down.

"Q. When did Mr. Brown tell you to tear the roof down? A. Oh, I don't know. Few days back. Week or so. I been working all the time.

'Q. Who did you look to, Christ, as your immediate supervisor, the shift boss, Mr. Brown or Mr. Cole or didn't you look to anybody as your boss? A. I don't know. I guess everybody boss me.

"Q. Well, who did you look to for your orders? A. Mr. Brown mostly.

"Q. You looked directly to Mr. Brown for your orders? A. I took orders from him most of the time.

"Q. And anything Mr. Cole might have said to you you disregarded? A. Oh, no, he come outside once in a while.

"Q. Then when he asked you about the operation of this hoist you told him that you wouldn't do it, you weren't going underground? A. Yeah, I told him I not belongs underground because the shifter already told me to take my bucket inside and stay steady.

"Q. The shifter told you that? A. Yes, so I can see, you know, they figured to put me inside steady.

"Q. He didn't tell you that it was just a temporary deal until the burned hoistman returned or the regular hoistman returned? A. No. I asked the shifter what you mean by take my bucket. 'Well', he said, 'That's Mr. Cole's orders. Don't blame me for it.'

"Q. You told the shifter you weren't going to go underground then when Mr. Cole saw you outside you told him the same things, is that right? A. Yes.

"Q. Did you tell them why? A. Yes, I told them why, because I don't belongs underground. I can't go underground.

"Q. Did you tell them why you couldn't go underground anymore? A. Yeah, I told them."

Appellant's ensuing testimony describes the smoky and dusty condition at the hoist due to blasting and clearly indicated he considered it was injurious to his health to stay in this tunnel all the time.

Evidence on behalf of the employer was to the effect there was ventilation at this place, though the smoke and dust from the blasting, in escaping, was wafted past the hoist through the tunnel where the hoist was located.

Upon appellant's discharge, Mr. Cole immediately had a shifter come in and take over the operation of the hoist. No emergency condition existed or was shown to exist. There was no disruption of work in the mine. Conceding the safe operation of the mine required constant attendance at this hoist, appellant's absence was for a very short period and he was easily and immediately replaced.

■ The statute is to be liberally construed in favor of the employee. In re Potlatch Forests, Inc., 72 Idaho 291, at page 298, 240 P.2d 242.

■ Whether or not appellant was mistaken in thinking he was being permanently placed at the hoist inside the mine, the directions as he received them, or as he understood them, as given by Cole and the shifter were somewhat conflicting and confusing. He was not recalcitrant or capricious in his refusal to return to the hoist, but apparently was justifiably concerned about his health, knowing he had an incurable condition which, though perhaps not aggravated by the smoke and dust, was at least irritated thereby. Therefore, there is absent any element of wilfulness, essential to constitute misconduct.

These circumstances do not justify a finding of fact or conclusion that appellant, in not returning to the hoist, was guilty of misconduct within the meaning of the statute. Boynton Cab Co. v. Neubeck, 237 Wis. 249, 296 N.W. 636; Boynton Cab. Co. v. Schroeder, 237 Wis. 264, 296 N.W. 642.

The Order denying compensation, therefore, is *reversed* and the cause remanded for appropriate proceedings in accordance with the conclusions herein stated.

Costs to appellant.

PORTER, C. J., and THOMAS, J., concur.

KEETON, J., with whom TAYLOR, J., concurs, dissenting.

I am unable to concur in the majority opinion.

The question presented in this proceeding is a determination of whether or not the claimant Mandes was discharged by the Sidney Mining Company for misconduct rendering him ineligible for employment security benefits. Claim for benefits having been denied, the matter was heard by the Appeals Examiner for the Employment Security Agency.

The claimant, being affected with silicosis, had been given light surface work and had been paid the wages of a miner for a period of time prior to his discharge. The Company had furnished him a place where he could batch, and it plainly appears that the claimant was carried on the payroll because of his condition and satisfactory work for a prior period of time. He performed various odd jobs and during the temporary disability of a hoistman was asked to operate a hoist on the 500 ft. level, which place of employment the Appeals Examiner, on competent evidence, found to be a dry and well ventilated station, not exposing him in any way to further silicosis infection.

As a safety measure it was necessary that a hoistman remain at this station at all times. Claimant operated the hoist in question for about three weeks. Then without notice to the employer, the foreman, or anyone else, at the lunch hour in the middle of his shift, claimant abandoned the job, left the location in which he was working, and the hoist unattended. When asked by the foreman why he was not at the hoist claimant:—

"brusquely replied that he would not operate the hoist any longer and he wasn't supposed to work underground. He gave no further reasons or explanation. Claimant was given three opportunities to change his mind and return to the hoist. Upon his continued refusal to do so he was informed that his services were terminated and to pick up his time at the office in town."

The Appeals Examiner concluded that the employer was entitled to some explanation or claimant's reason for not operating the hoist and, if reasonable, to make different arrangements for its operation; that

"claimant did not do this, but showing a disregard for a supervisor's authority, bluntly and without further explanation, refused to perform his duties as assigned, which could have placed his employer in a very embarrassing position."

The Examiner concluded:

"A foreman must be in a position of enforcing some respect from his immediate employees, in order that the work in his department can be satisfactorily carried on. If all his subordinates felt free to speak to him in the vein employed by the claimant, we can easily understand that the discipline and morale of this particular department might show a marked deterioration over the course of time. There is nothing in the evidence to indicate that the work being done by the claimant, at the time of his discharge, was in any way affecting his health. We have every reason to believe, considering the past work history of the claimant, that the order given by the mine foreman was reasonable and could have been performed by the claimant. Failure of the claimant to follow through convinces us that the employer was justified in discharging him."

The employer's conduct was not arbitrary, but its order was proper and legitimate, and should have been complied with by claimant.

The findings and decision of the Board, from which this appeal is taken, confirmed the decision of the Examiner, and from the evidence and the Examiner's findings, the Board found that claimant had previously stated he would work on the hoist until the regular hoistman returned; that the hoist operation was an extremely simple procedure and the place where the hoist was located was dry and well ventilated, and that the place where he was asked to work in nowise was dangerous to claimant's health, and concluded that claimant had *wilfully* failed to produce work which might be reasonably expected of him, and such wilful failure amounted to misconduct.

The excuse given by claimant for leaving the hoist, when it was imperative that it should be attended, was because of his silicosis condition. This condition had not arisen suddenly, nor was it aggravated in any degree by the operation of the hoist.

The Examiner and the Board are the fact finding body in this proceeding, and it is not, or should not be, the province of this court to make findings contrary thereto, when supported by substantial evidence, as is the case here.

Misconduct, by the provisions of section 72–1366 I.C., makes claimant ineligible for the benefits claimed. The statute provides the eligibility of a benefit claimant, and subdivision (f) reads:

"His unemployment is not due to the fact that he left his employment vol-

untarily without good cause, or that he was discharged for misconduct in connection with his employment; * *."

The majority opinion reads into the act "wilful" misconduct.

If claimant refused to obey a legitimate, proper order, it necessarily follows that the misconduct was wilful. It does not seem to me necessary for the one resisting payment of unemployment benefits to have to prove affirmatively, beyond a reasonable doubt, or to a certainty in every particular, that a claimant is ineligible within the provisions above quoted. Wilfulness must be determined by claimant's external acts and conduct. What he might have had in his mind to do other than what he did, we do not know.

I think the majority opinion reads into the act something the legislature did not intend. The legislature declared in no uncertain terms that the purpose of the law is to provide "for the benefits of persons unemployed through no fault of their own". Section 72–1302 I.C. The findings of the Board and the Appeals Examiner, under circumstances presented, are fully sustained by the evidence and are binding on this Court.

This Court should not re-examine the evidence for the purpose of reaching a conclusion different from that of the fact finding body, when its findings and conclusions are supported by the evidence.

A claimant for benefits, who wilfully fails to produce work which might be reasonably expected of him, or who is discharged for failing to carry out a reasonable, proper order in connection with his employment, or one who wilfully and voluntarily abandons his job without notice or without excuse, is guilty of wilful misconduct, his discharge proper, and he is not entitled to benefits provided for one who, without fault of his own, is temporarily out of work.

The Act providing unemployment benefits in certain cases, and under prescribed conditions, was intended to apply to, and should be construed to encompass, a person able and willing to work, and who is unable, through no fault of his own, to obtain employment.

It seems to me the majority opinion lets the bars down and opens the flood gates for unauthorized claims. Such a holding is detrimental to the employees as well as the employers, and I feel the majority opinion is not in accord with the weight of authority in similar situations, and that the Order of the Board should be affirmed.