379 P.2d 664

**CUSTOM MEAT PACKING COMPANY,
Appellant,**

v.

**Ruby M. MARTIN, Claimant for Employment
Security Benefits, and Employment
Security Agency, Respondents.**

**No. 9255.**

Supreme Court of Idaho.

March 8, 1963.

J. M. Lampert, Eli A. Weston, Boise, for appellant.

William F. Galloway, Boise, for respondent Ruby M. Martin.

John W. Gunn, Boise, for respondent Employment Security Agency.

TAYLOR, Justice.

Ruby M. Martin, claimant (respondent), was employed by Bert T. Kinzer and Arliss Joslin, d. b. a. Custom Meat Packing Company, employer (appellant), from November, 1959, to February 10, 1962. After termination she made claim for unemployment benefits, assigning as the reason for termination that another worker had been hired; that work slacked off; and that she was laid off. "I feel that they wanted me to quit, but I would not, so they had to lay me off."

The employer resisted the claim, asserting that claimant had been discharged for misconduct in connection with her employment.

The determinations examiner determined that claimant was discharged for misconduct and was not eligible for benefits. Thereafter, hearing was had before an appeals examiner at which witnesses were sworn and testified in behalf of both claimant and employer. The appeals examiner reversed the decision of the determinations examiner; ruled that claimant was discharged, but not for misconduct; and allowed benefits.

Upon application of the employer, the proceeding was reviewed by the Industrial Accident Board. The board affirmed the decision of the appeals examiner. No witnesses were examined before the board. Its decision was based upon the record made at the hearing before the appeals examiner.

Where witnesses are not examined before the board and its findings and conclusions are based upon a written record, the rule that findings based upon conflicting evidence are conclusive on appeal, does not apply, and such findings are not binding upon this court. In re Markham's, Inc., 79 Idaho 307, 316 P.2d 553; Mandes v. Employment Security Agency, 74 Idaho 23,

255 P.2d 1049; Phipps v. Boise Street Car Co., 61 Idaho 740, 107 P.2d 148. In the latter case the effect of the constitutional amendment limiting this court to a review of questions of law in cases of appeal from the Industrial Accident Board was considered. It was there determined that the amendment did not make findings of the board, which were based upon a written record, binding upon this court.

The evidence for the most part is in direct conflict as to the reasons for termination of claimant's employment. We summarize part of it here, not for the purpose of making findings contrary to those made by the board, but for the purpose of illustrating the character of the conduct with which the employer was dealing, and to demonstrate that the board drew erroneous conclusions therefrom. Those conclusions were as follows:

"While claimant may have been guilty of certain acts or omissions relating to her employment, which when considered together might constitute misconduct within the meaning of the Employment Security Law, virtually all of them occurred prior to claimant's transfer to the sausage kitchen in October 1961. This transfer ameliorated the basic complaints of her employer, and the Board concludes that the employer tacitly condoned or overlooked the basic grievances which he had against claimant.

"The Board also concludes that the prime and moving cause for claimant's discharge was her purported, unauthorized contact with a customer for the purpose of persuading the customer to delay a visit to the employer's premises, and that the employer was laboring under a basic and controlling misapprehension of fact therein.

"The Employment Security Law is to be construed liberally in favor of the employee. Applying that rule of construction, there is substantial evidence to support the decision of the Appeals Examiner under review here, and the Board as a matter of law cannot properly hold that the Appeals Examiner was erroneous in this determination."

The incident which precipitated claimant's discharge occurred on Friday, February 9, 1962. Mrs. Stayner, a customer, had ordered a beef loin, a beef tongue, and a veal liver, which she was to call for on February 9th. Claimant was not working on Friday afternoon. She called Mrs. Stayner from her home and advised that she, claimant, was not at work that day, but would be back on the job Monday; that the liver was not in stock; that the customer could call for so much of the order as was available, or call for all of it later. The

customer responded that she would wait until Monday or Tuesday. Claimant then, by phone, advised Mrs. Joslin, bookkeeper at the plant, that the customer would not call that day. ·Learning of this, Mr. Kinzer phoned claimant that he did not approve of her contacting customers and telling them not to call for meats ordered. Claimant told her employer she had not advised the customer not to come that day. At claimant's request the customer subsequently, by phone, advised Mrs. Joslin to that effect. However, on Saturday morning, in a further telephone conversation, the employer notified claimant she was discharged for that, and other reasons.

When the employer, at the hearing, was asked what occurred leading up to claimant's termination, he answered:

"A. Well, it wasn't anything that happened all at once. It was her misconduct from some time back. I couldn't tell her to do anything but what she would always talk back to me, and her—weinies, she would not put them in the package and put them in neat so that they would go out like they should go out. She's a fast worker and a good worker. I say that, but she is a sloppy worker, and she would not clean up her table. In fact, you had to follow her around all the time. And as far as her language is concerned, why, I believe she's a little short on the words that she used.

"Q. Do you mean that it was actually worse than has been stated?

"A. Yeah, that's right.

"Q. Uh-huh. Now when you told her that the weiners were not what they should be, that the packaging was sloppy and so forth, what did she say?

"A. Well, I couldn't tell you what she said. She always would talk back to me. It didn't make any difference what I said to her in regards to her work, when she wasn't doing it right, she would always talk back to me."

Other witnesses for the employer testified that claimant was not neat in her work; that her work was sloppy; that at quitting time she did not clean up her work table or the machines she had used; that retail outlets for the company's products frequently brought back packaged goods because the packaging had not been neatly done; that claimant used violent and profane language directed to her employers and fellow workmen and in the presence of customers.

During most of the period of her employment claimant worked in the front of the plant cutting, wrapping meat, operating the weiner packaging machine, and waiting on customers. About October 1, 1961, the employer transferred claimant to the sausage kitchen where her lack of neatness and her language would not be offensive to customers. Another woman employee replaced

claimant in the cutting, wrapping and packaging room. The employer stated the reason for the change:

"A. * * * it was her unneatness that I put her back in the kitchen. The stores blamed me theirselves that—that our work that she was putting out was not done up neat enough. And this other lady was doing her work neat. And her profane language that she used before customers that came in there, I put her in the back in the kitchen so as to get her away from the people that came in there.

"Q. But you didn't ever say anything about this profane language, do I understand that correctly?

"A. Yes, I did. I did.

"Q. You did?

"A. I asked her several times to be careful with her language.

"Q. Did you get an answer?

"A. Oh, I don't know whether I did or not. If I did, it didn't amount to much. And she'd be careful for a while, and then it's the same old thing."

After her transfer to the kitchen, claimant worked in the cutting, packaging and wrapping room when she was not needed in the kitchen.

Mr. Kinzer testified that he repeatedly called claimant's attention to her lack of neatness and cleanliness; to her offensive language; to her failure to clean up the packaging machine; and asked her repeatedly to correct these deficiencies. He further testified that on these occasions she became argumentative and talked back to him. The testimony of Mr. Kinzer in these respects was corroborated by Mrs. Joslin and two other employees. Such conduct was for the most part denied by claimant. Responding to her testimony that she never left the packaging machine without cleaning it up, Kinzer's testimony was that she merely wiped it off and that such cleaning was not sufficient to keep the equipment within the permissible range of bacteria count to meet the requirements of federal inspectors. However, claimant did admit that her employer had called attention to her uncleanliness and want of neatness, but said it was very infrequent. As to cleaning the machine, and after denying that she ever left it unlean, she testified as follows:

"Examiner: Did you understand that you were to clean the machine?

"Mrs. Martin: Yes, I understood I was to clean the machine.

"Examiner: Did you ever go away and leave it because it was 4 o'clock and time for you to go home?

"Mrs. Martin: I might have. I can't remember.

"Examiner: And leave it dirty that day?

"Mrs. Martin: Yes—but I might have. I can't remember that. If I did, it was very few times."

On one occasion near the end of the day, Joslin, one of the partners, had asked the employees to put some peppers to soak. Claimant responded that they did not have time to do it and that the peppers would be too hard on their hands because they would be too dry. While engaged in stemming the peppers, claimant became angry at Joslin because of a remark he jokingly made about her sitting posture. Whereupon she "called him a S.O.B. and slapped him across the face." This was in the presence of four other employees. Concerning this incident, the board found:

> "Claimant at times used profane language in the presence of customers and on one occasion cursed at her employer and slapped him."

On another occasion, while claimant was working in the sausage kitchen, Mr. Kinzer went back to the kitchen and, calling attention to some short weiners, said he didn't want weiners put out like that. Claimant responded that the sausage linker had "broke down" and it wasn't her fault. The employer did not reply, but went back out front. A few minutes later, according to claimant, it was necessary for her to go through the front packaging room and upstairs to get some casings for the sausage and that being "a little bit irritated from the way he had talked to me, and I said to Mr. Kinzer, I said, 'Well bert,' I said, 'I want to tell you what was the cause of those weiners,' I said, 'the machine broke down. It was nothing I could help,' and went on back and went to my work in the kitchen." Concerning this, the employer testified that she did not go upstairs for casings, but came out and directly confronting him, "hollered and yelled at me." Asked if he said anything to her at that time, the employer testified, "I didn't have time. She turned around and beat it back to the kitchen just as hard as she could go, and I never said nothing to her because it would just stirred up a fuss with her if I said anything to her." This was in the presence of Mrs. Joslin, Mrs. Botnick, and within the hearing of two telephone company employees who were at the time installing a telephone. Asked to repeat what was said, Mrs. Joslin replied, "That's a little rough." The examiner did not press further for the exact language. Instead, he asked:

"Q. And, Mrs. Joslin, were these words that hadn't been used around the plant before?

"A. They've been used before.

"Q. By the women?

"A. Well, to my knowledge she's the only woman that has ever used

those words around there. We have had a number of women work there.

"Q. And these words you figure even though there is a certain relaxed atmosphere, we'll say, in the area were not apropos to the situation, is that it?

"A. That's right.

"Q. Was she angry?

"A. Yes.

"Q. Did she, we'll say, read off Mr. Kinzer?

"A. Well, if that's what you want to call it, I suppose I would. I mean, she came out and said it in a loud voice.

"Q. And it was profanity?

"A. Yes."

Concerning the same incident, Mrs. Botnick testified:

"Q. Did you overhear the language used?

"A. Yes, sir.

"Q. I see. Was it language which would be used in polite society?

"A. No, sir.

"Q. Was it language which was customarily used in the Custom Packing Plant?

"A. By some people.

"Q. By the women?

"A. Well, I very seldom ever swear. If I do, it isn't anything that

you can—I mean, that was really—really bad.

"Q. Was it words that you would not use then?

"A. It—yes, sir."

Both Mrs. Joslin and Mrs. Botnick testified to overhearing the telephone employees remark, "Oh, boy, do they talk like this to their employer?"

In the sausage kitchen claimant was placed under the immediate direction of a Mr. Walker, who was in charge there. Shortly after the transfer, Walker came into the front from the kitchen and complained to Mrs. Joslin that claimant would not do her work in the kitchen the way he wanted it done. To which Mrs. Joslin replied, "Give her a chance, and try some more." The following Saturday he came into the front again and told Mr. Kinzer in Mrs. Joslin's presence that claimant would not follow his instructions and would not do the work the way he asked her to. Mr. Kinzer also testified that Walker called at his house and there made the same complaint about claimant's work in the kitchen, and that, "Ruby [Mrs. Martin] had come to me and said, 'I'm not going to work with that son-of-a-bitch any more.'" By way of a letter from Walker, the examiner was advised that Walker and claimant got along very well in the kitchen. To the contrary, Mr. Kinzer and Mrs. Joslin testified that the two fought all the time.

While a Mr. Aldape, who had worked at the plant, a witness for claimant, was testifying, the following colloquy occurred between him and Mr. Kinzer:

"Mr. Kinzer: She done her work sloppy, and Joe [Aldape], you can't say she done it neat.

"Mr. Aldape: Well, I'll go along with you on different items on that myself.

"Mr. Kinzer: And the stores objected to the sloppy work that she put out, and you know that she would swear and it wasn't damn or God or no such little words as that.

"Mr. Aldape: I know that."

Another employee, Mr. Heath, testified that claimant frequently violated the employers' rule against smoking while working with meat and, "I've heard Mr. Kinzer tell Ruby many a time to take that cigarette out of her mouth." And Mr. Kinzer testified that he observed her smoking over the sausage table in the sausage kitchen.

Concerning claimant's general conduct, the board found:

"Until the first part of October 1961 claimant's duties consisted generally in 'peeling weiners,' cutting and packaging meat, and waiting on customers. The evidence generally is to the effect that claimant worked hard and fast, but that her work was not always neat; her employer termed it 'sloppy.' Claimant was apparently more impressed with the necessity of speed than neatness, and her packages of meats occassionally had to be rewrapped or resulted in complaints from purchasers. There is also evidence that claimant did not clean the cutting and packaging equipment each day as required at quitting time. Claimant was reprimanded by her employer from time to time for this general lack of neatness and attention to detail, but was never given a definitive warning that failure to improve the the quality of work would result in discharge."

█ The board was not justified in finding that virtually all of claimant's transgressions occurred prior to her transfer to the sausage kitchen. Considering that her service in the cutting, packaging and wrapping room extended over the greater portion of her period of employment, it is correct to say that the greater portion of her misconduct occurred while she was there employed. Then too, her comparatively short period of employment in the kitchen was interrupted by her absence from December 19, 1961, to January 22, 1962, due to a personal injury. However, the record is conclusive that her misconduct continued while she was employed in the sausage kitchen. The conclusion of the board that the "transfer ameliorated the basic complaints of her employer" and "that the

employer tacitly condoned or overlooked the basic grievances which he had against claimant," is without support in the record. Her misconduct continued uninterruptedly up to and including the incident which precipitated her discharge. Neither is the board's conclusion that the "prime and moving cause for claimant's discharge was her purported, unauthorized contact with a customer." Mr. Kinzer testified repeatedly throughout the hearing before the examiner that the incident of her telephoning the customer was a comparatively minor one, and at one point characterized it, "That's a very small item as far as I am concerned." He insisted throughout that it was her continued lack of neatness, uncleanliness, back-talk, disrespect, profanity, failure to comply with directions, and violation of rules laid down by him, which was the fundamental cause of her discharge. Claimant herself testified her employer had become "irritated" with her previously.

"The personal eligibility conditions of a benefit claimant are that—* * *

"(f) His unemployment is not due to the fact that he left his employment voluntarily without good cause, or that he was discharged for misconduct in connection with his employment. * * *." I.C. § 72–1366.

We have defined the term "misconduct" as used in the foregoing section as:

"wilful, intentional disregard of the employer's interest; a deliberate violation of the employer's rules; or a disregard of standards of behavior which the employer has a right to expect of his employees." Johns v. S. H. Kress & Company, 78 Idaho 544, at 548, 307 P.2d 217, 219.

In the same case it was also said:

"Where one has suitable employment and refuses to work under reasonable regulations and conditions, and pursuant to reasonable directives of management, such person is not within the terms of the Act, allowing benefits." 78 Idaho at 547, 307 P.2d at 219.

The legislature has declared the public policy pursued in the enactment of the Employment Security Law to be "encouraging employers to provide more stable employment and by * * * the compulsory setting aside of unemployment reserves to be used for the benefits of persons unemployed through no fault of their own." I.C. § 72–1302. To implement such "encouragement" employers who provide their employees with "more stable employment," with fewer lay-offs or discharges, are given a more favorable "experience rating," resulting in lower tax contributions to the unemployment fund. I.C. § 72–1351.

■ The conclusion of the board in this case would penalize an employer, such as

appellant, who over a period of time overlooks misconduct and tries to obtain the cooperation, respect and loyalty of his employees, and their compliance with necessary rules and standards of behavior. The rule adopted by the board is diametrically opposed to the policy of the law. Its adoption would require an employer to discharge an employee upon the first appearance of misconduct, whereas the policy of the law is to encourage the employer and employee to adjust their differences and thus avoid interrupting the employment.

■ The rule applied by the board that, "The Employment Security Law is to be construed liberally in favor of the employee," is not the rule in this jurisdiction. As between employer and employee, the law is not to be construed in favor of either.

"The purpose and intent of the Unemployment Compensation Law, which should be liberally construed to accomplish its humanitarian purpose, is to provide unemployment compensation benefits to those unemployed through no fault of their own. Compensation benefits paid to self-imposed unemployed would be payment contrary to the spirit and letter of the Unemployment Compensation Law." Talley v. Unemployment Comp. Div., 63 Idaho 644, at 649, 124 P.2d 784, at 785.

"The Unemployment Compensation Law must be liberally construed to the end that its purpose be accomplished." Hagadone v. Kirkpatrick, 66 Idaho 55, at 59, 154 P.2d 181, at 182.

Striebeck v. E. S. A., 83 Idaho 531, 366 P. 2d 589; Johnson v. E. S. A., 81 Idaho 560, 564, 347 P.2d 764; Doran v. E. S. A., 75 Idaho 94, 267 P.2d 628; In re Potlatch Forests, Inc., 72 Idaho 291, 298, 240 P.2d 242; Webster v. Potlatch Forests, Inc., 68 Idaho 1, 187 P.2d 527. In the Potlatch Forests case, 72 Idaho 291, at 298, 240 P.2d, at 246, Justice Thomas said:

"This is an act providing, among other things, for revenue or a tax; and it must be construed strictly in favor of the taxpayer."

However, that was a proceeding to determine the appellant's experience rating, and did not involve a claim for unemployment benefits. Regarding construction of the statute, Justice Thomas in that case further said:

"This statute, liberally construed to accomplish its declared purpose, clearly contemplates that such employer, for the purpose of determining his first experience rate in 1947 and at all times thereafter as long as such Act is effective, shall not be charged with benefit payments made to any of his employees who voluntarily quit without cause or who were discharged for

cause at any time after December 31, 1939." 72 Idaho at 299, 240 P.2d at 246.

It is true that the language employed by the board was used in Mandes v. E. S. A., 74 Idaho 23, 255 P.2d 1049; however, the sole authority cited was the Potlatch Forests case in 72 Idaho 291, 240 P.2d 242, which contains the correct statement of the rule as set out herein.

The rule followed by the board would tend to defeat the purpose of the law in that it would result in withdrawals from the fund in some cases in which the recipients were unemployed by reason of their own fault. I.C. § 72–1302.

"The law, therefore, enjoins upon the employment security agency, and all those having to do with the administration of the law, the duty of safeguarding the employment security fund from the claims of unworthy and ineligible claimants, so that funds will be available for the relief and benefit of those whom the law seeks to protect. It is for this reason that the burden of establishing eligibility is placed upon, and must be borne by, the claimant whenever his claim to benefits is questioned." Doran v. Employment Se-curity Agency, 75 Idaho 94, at 98, 267 P.2d 628, at 631.

The suggested rule of liberal construction in favor of the employee would also run counter to the rule firmly established in this jurisdiction that the burden of establishing eligibility rests upon the claimant. Ankrum v. E. S. A., 83 Idaho 274, 361 P.2d 795; Rasmussen v. Gem State Packing Co., 83 Idaho 198, 360 P.2d 90; Ellis v. E. S. A., 83 Idaho 95, 358 P.2d 396; Norman v. E. S. A., 83 Idaho 1, 356 P.2d 913; Cahoon v. E. S. A., 82 Idaho 224, 351 P.2d 477; Bean v. E. S. A., 81 Idaho 551, 347 P.2d 339; Watts v. E. S. A., 80 Idaho 529, 335 P.2d 533; Claim of Sapp, 75 Idaho 65, 266 P.2d 1027; Talley v. Unemploy. Comp. Div., 63 Idaho 644, 124 P.2d 784.

The record reveals "misconduct in connection with his [her] employment" fully justifying the employer in terminating her employment. Bean v. E. S. A., supra.

The order appealed from is reversed.

No costs allowed. I.C. § 72–1375(b).

KNUDSON, C. J., and McQUADE, McFADDEN and SMITH, JJ., concur.