714 P.2d 36

**Michael J. SWEENEY, Claimant-appellant,**

v.

**GREAT WEST TRANSPORTATION, Employer,**

**and**

**Industrial Indemnity Company, Surety, Defendants-respondents.**

**No. 15809.**

Supreme Court of Idaho.

Jan. 14, 1986.

Gardner W. Skinner, Jr., Boise, for claimant-appellant.

Kenneth C. Howell, of Hawley, Troxell, Ennis & Hawley, Boise, for defendants-respondents.

BAKES, Justice.

Appellant Michael J. Sweeney (hereinafter claimant) appeals an order of the Industrial Commission denying his claims for additional workmen's compensation benefits. Claimant argues on appeal that the commission erred in holding that: (1) he did not present any medical evidence to support his claim of disability for the period between June 28, 1983, and July 16, 1983; (2) he failed to present evidence sufficient to establish a causal connection between an elbow injury suffered in February, 1984, and on-the-job accidents in June and July of 1983; (3) he was not entitled to payment of medical expenses incurred as a result of the February injury; and (4) he was not entitled to attorney fees based on the finding that the surety had not acted unreasonably in denying benefits in February. We find substantial, competent evidence in the record to support all of the commission's holdings except for the first. We therefore affirm in part, reverse in part, and remand.

Claimant began working as a long haul truck driver for respondent Great West Transportation, Inc., in May, 1983. In June, while on a trip for respondent, claimant injured his left forearm in the area of his elbow. The injury occurred in Massachusetts on June 22, 1983, while loading 55-gallon drums of frozen orange juice; one of the barrels slipped off a pallet and slammed claimant into the side of the trailer. Despite the injury, claimant continued on the trip, returning to Boise on June 27, 1983. He gave oral notice of the injury to his employer the following day, June 28, 1983. Claimant remained off work for the following two and a half weeks. During that period, when offered a chance to drive a load, claimant declined because of the injury.[1] However, during this time claimant did not see a doctor, nor was he requested to do so by his employer.

Claimant returned to work on July 16, 1983, driving on a longhaul trip to Florida. One day into the trip, while in Wyoming, the tractor-trailer broke down. In the process of attempting repairs, specifically adjusting the transmission linkage on the tractor, claimant again injured his left elbow. This time the injury was severe

---

1. Claimant specifically testified at the subsequent hearing before the commission referee that he advised his employer that he was taking the time off because of the injury. There is no contrary evidence.

enough that claimant sought medical attention at a nearby hospital. He was prescribed pain medication and told to see a specialist upon his return to Boise. Notice of this injury was given to respondent on July 18, 1983, by telephone. Claimant returned to Boise on July 27, 1983, and was terminated the following day.[2]

Written notice of both injuries was filed August 1, 1983, and claimant subsequently saw Dr. Floyd Johnson for treatment on August 2, 1983. Claimant was under Dr. Johnson's care until December 24, 1983. Dr. Johnson instructed claimant not to work for thirty days. Dr. Johnson also had claimant examined by Dr. Richard Wilson, a neurologist. Dr. Wilson first examined claimant on August 11, 1983, at which time he determined, *via* EMG tests, that claimant suffered no nerve damage in the injured arm. Dr. Wilson later concluded that claimant's injury was a soft tissue injury, *i.e.*, a contusion of the elbow. Following these examinations claimant was placed on total temporary disability (TTD) benefits from July 28 through October 26, 1983, at which time he was given a work release by Dr. Johnson. However, the problem continued and claimant was again placed on TTD benefits on November 21, 1983. At Dr. Johnson's request, Dr. Wilson again saw claimant on December 9, 1983. Dr. Wilson recommended that claimant be released for light duty work for two weeks, following which he could be released to full duty work. Pursuant to Dr. Wilson's recommendation, claimant was released to full work status on December 24, 1983, at which time his TTD benefits also terminated.

Following his full work release, claimant was unable to find work as a truck driver. During the months of January and February, the only work that he performed was cutting firewood for himself and a neighbor. He again began to experience pain in his arm and, in February, 1984, upon his counsel's recommendation, saw Dr. Michael

O'Brien. Dr. O'Brien diagnosed the claimant's primary problem as a epicondylitis (tennis elbow), and recommended that he refrain from any physically strenuous type of activity in order to permit the elbow to heal. Claimant did not inform either Great West Transportation or its surety that he was going to another doctor.

On February 15, 1984, claimant's counsel contacted employer's surety and requested that the surety immediately place claimant back on TTD benefits and reimburse him for expenses incurred in visiting Dr. O'Brien. The surety declined the request to reinstate the benefits based in part upon a telephone conversation with Dr. O'Brien in which he stated to the surety that claimant's problems were not related to the prior industrial accidents.

On April 5, 1984, claimant moved for an emergency hearing on the questions of reinstatement of TTD benefits and payment of medical expenses incurred with Dr. O'Brien. The matter was heard before a commission referee on May 4, 1984, with the later addition of deposition testimony by Doctors O'Brien and Wilson.

The Industrial Commission entered its order denying relief in every instance on July 19, 1984. Claimant timely moved for reconsideration. The motion for reconsideration was denied on October 17, 1984. This appeal followed.

### I

■ In its findings of fact and conclusions of law the commission held that claimant was not entitled to TTD benefits for the two and a half week period between the first and second accidents of June and July, 1983. The commission's decision was based entirely on its finding that claimant had failed to present "any medical evidence" which would support his claim for benefits. Claimant contends that this conclusion is erroneous and without support in the record. We are inclined to agree.

---

**2.** The reasons for claimant's termination are not before this Court nor are they germane to any of the issues on appeal.

In *Sykes v. C.P. Clare & Co.*, 100 Idaho 761, 605 P.2d 939 (1980), we stated the general rule that claims for workmen's compensation benefits must be supported by medical testimony. *Sykes*, 100 Idaho at 764, 605 P.2d at 942. However, we also specifically stated that compliance with this rule did not require a claimant to be under the care of a physician at the time of the alleged disability in order to successfully claim benefits. "Whether an individual is disabled is not determined by whether that person is under the care of a physician but whether that person has suffered a decrease in wage earning capacity." *Id.*

Our review of the record indicates that even though claimant did not see a physician during the two and a half week period, there is medical evidence[3] which, when coupled with claimant's testimony[4] and surety's admissions,[5] could permit a finding of temporary disability. We therefore remand this issue to the commission for further consideration and weighing of the evidence to determine if claimant is entitled to TTD benefits for the period June 28 through July 16, 1983.

## II

Claimant next contends the commission erred in holding that he failed to establish a causal connection between the on-the-job accidents of June and July, 1983, and his later complaints of injury in February of 1984. Claimant argues that there is substantial competent evidence to support his theory of causal connection and none to support the commission's conclusion. We disagree.

Claimant's argument when viewed in its best light at most establishes a conflicting view of the evidence before the commission. It is by now axiomatic that the weighing of conflicting evidence is left to the sound discretion of the Industrial Commission and will not be overturned on appeal unless its conclusion is clearly erroneous, *i.e.*, unsupported by substantial competent evidence on the record.

■ In making its determination the commission had before it the testimony of two examining physicians, Drs. O'Brien and Wilson, both neurologists. The record discloses the following with regard to their testimony. Dr. O'Brien testified that claimant's current problems were causally connected to his prior accidents of June and July, 1983. Dr. Wilson testified to the contrary. Dr. O'Brien diagnosed claimant's condition in February, 1984, as epicondylitis, tennis elbow. Dr. O'Brien stated that this condition was an irritation or inflammation of the extensor muscles and accompanying tendons connected at the elbow region of the forearm. Dr. Wilson diagnosed claimant's earlier injury as "a left elbow contusion," *i.e.*, a soft tissue injury. Dr. Wilson also testified that when he examined claimant in April, 1984, claimant localized his current complaint somewhat differently than he did in the August, 1983, examination immediately after the June and July incidents. Dr. O'Brien did not see claimant until February, 1984, some seven months after the last on-the-job accident. Dr. Wilson, on the other hand, saw claimant shortly after his June and July, 1983, injuries; again prior to his work release in

---

**3.** In his report dated February 2, 1984, to both the surety and claimant's attorney, Dr. Michael O'Brien opines that "the primary problem" of claimant's on-the-job injuries stems from the earlier of the two injuries, *i.e.*, the June 22, 1983, incident. Furthermore, Dr. Wilson in his December 9, 1983, report to Dr. Johnson, when referring to the incident resulting in claimant's injury and subsequent disability, specifically refers to the facts surrounding the June 22, 1983, accident (though mistakenly giving the July 16, 1983, date).

**4.** Claimant, as noted earlier, specifically testified that he stayed off work during the two and a half week period because of the injury and so advised his employer at the time.

**5.** It is also important to note in connection with this issue that defendant respondent surety, in its Answer to Application for Hearing (a rough equivalent of a responsive pleading), appears to deny claimant's claim of temporary disability only with regard to the period following the December 24, 1983, full work release. The answer admits disability up to that time.

December, 1983; and again in April, 1984, prior to the hearing before the commission.

With this medical evidence before it, the commission chose to resolve any conflict between Doctors O'Brien and Wilson in favor of Dr. Wilson.

"The [commission] gives greater weight to the testimony of the physician who saw the Claimant both in August of 1983 and subsequently in December, 1983, and April, 1984, and his conclusions that the Claimant had suffered a contusion from which he could have been, and was, released without restriction in December of 1983."

We hold there is substantial competent evidence to support the commission's conclusion that claimant's elbow problems of February, 1984, were the result of an independent, intervening cause and not causally related to his earlier on-the-job accidents.

### III

Claimant's argument that he is entitled to payment of expenses incurred in seeing Dr. O'Brien is rendered moot by our holding that the commission correctly concluded that no causal connection existed between his February, 1984, injury and his on-the-job injuries of June and July of 1983. Respondents employer and surety are only liable for medical expenses incurred as a result of "an injury" (i.e., an employment related accident), or "disability from an occupational disease." I.C. § 72–432(1). An employer cannot be held liable for medical expenses unrelated to any on-the-job accident or occupational disease.

We also note that, in any event, I.C. § 72–432(4) requires an employee to notify his employer or surety if he desires to see a different physician than the one provided by the employer. The same provision states that failure to provide such notice negates the employer's obligation to pay for expenses incurred in seeing the new physician. Claimant clearly conceded that such notice was not given. The commission therefore correctly concluded that employer's surety was not liable for expenses incurred in seeing Dr. O'Brien.

Finally, claimant argues that employer's surety acted unreasonably in denying his request for reinstatement of TTD benefits in February, 1984, and therefore he was entitled to an award of attorney fees pursuant to I.C. § 72–804. We find this argument without support in the record. The commission's conclusion that the employer acted reasonably in declining claimant's request for benefits is supported by substantial, competent evidence.

The decision of the Industrial Commission is affirmed, except that portion of the decision of the commission regarding the claim for TTD benefits from June 28, 1983, through July 16, 1983, which is reversed and remanded for further consideration consistent with Part I of this opinion.

No costs or attorney fees allowed.

DONALDSON, C.J., and SHEPARD and HUNTLEY, JJ., concur.

BISTLINE, Justice, concurring in part and dissenting in part.

I concur with Part I of the majority opinion, which holds that Sweeney presented sufficient medical evidence of temporary disability during the period of June 28 through July 16, 1983. However, I disagree with the majority's procedure in applying the substantial competent evidence test in this case, where the decision below was made on the same, "cold" record that is now before us. Rather, if this Court were to fulfill its function as did other courts before us, we would review the record and make our determination. Having done so, I am inexorably drawn to the conclusion that the decision of the referee, which the Commission adopted, should be reversed. Accordingly, I respectfully dissent from part II of the majority opinion.

### I.

Sweeney has earnestly urged this Court to make its own independent review of the record. To no avail. The majority—without deigning any reply to Sweeney's request—examined the record only to ascer-

tain if substantial evidence in the record supports the Commission's findings. In the recent case of *Poss v. Meeker Machine Shop,* 109 Idaho 920, 712 P.2d 621 (1985), I detailed good reason for this Court to make its own review where the record which comes to us is the same cold written record to which the Industrial Commission had access. My *Poss* opinion is recommended reading for the trial bar, who in turn may want to call its attention to the legislators who hopefully may become interested in how it is that this Court has avoided making the effort it formerly made until 1979? For the sake of brevity, I will mention only salient parts from my *Poss* opinion.

Article 5, § 9 of the Idaho Constitution provides that on "appeal from orders of the industrial accident board the court shall be limited to a review of questions of law." In *Phipps v. Boise Street Car Co.,* 61 Idaho 740, 107 P.2d 148 (1940), this Court construed article 5, § 9, which had been then just recently amended to so provide, as not limiting this Court's review of the tribunal's findings of fact "[w]hen the trier or triers of facts does not or do not hear and see the witness face to face...." *Id.* at 747, 107 P.2d at 151. Rather, when findings are based on "written testimony ... [the agency's] findings are not, even under constitutional amendment ... conclusive on this court nor so intended to be by the people." *Id.* at 748, 107 P.2d at 151.

This statement, based on earlier holdings of the Court, was perhaps overruled in *Booth v. City of Burley,* 99 Idaho 229, 580 P.2d 75 (1979) and the substantial competent evidence test substituted. I say "perhaps" because it was not done knowingly; the author of Booth failed to disclose that *Phipps* was announced with a due regard for the then recent constitutional amendment. Instead, the author utilized selective editing to portray the *Phipps* holding as having been aught but case-precedent. The applicable part of *Booth* reads as follows:

> [S]everal prior decisions of this court have held that findings of fact by the Industrial Commission are not binding on

appeal when the Commission does not hear and see witnesses. In these cases, the court has suggested that it will independently review the record to determine whether a claimant is eligible for benefits under the Employment Security Law. *Clay v. Crooks Industries,* 96 Idaho 378, 529 P.2d 774 (1974); *Mata v. Broadmore Homes,* 95 Idaho 873, 522 P.2d 586 (1974); *Kirkbride v. Department of Employment,* 91 Idaho 658, 429 P.2d 390 (1967); *Custom Meat Packing Co. v. Martin,* 85 Idaho 374, 379 P.2d 664 (1963); *Wolfgram v. Employment Sec. Agency,* 75 Idaho 389, 272 P.2d 699 (1954); *Mandes v. Employment Sec. Agency,* 74 Idaho 23, 255 P.2d 1049 (1953); *Phipps v. Boise Street Car Co.,* 61 Idaho 740, 107 P.2d 148 (1940).

The justification for this expanded scope of appellate review has been based on the theory that, "When the trier or triers of facts does not or do not hear and see the witnesses face to face, the findings of such tribunal are not necessarily and *ipso facto* of any greater cogency than those of any other tribunal." *Phipps v. Boise Street Car Co.,* 61 Idaho at 747, 107 P.2d at 51. However, since this court's adoption of an expanded scope of review in *Phipps v. Boise Street Car Co., supra,* the Idaho Employment Security Law has been extensively amended to provide an initial determination of eligibility for unemployment benefits, four levels of agency review and judicial review by this court. I.C. § 72–1368; *Department of Employment v. St. Alphonsus Hospital,* 96 Idaho 470, 531 P.2d 232 (1975). These statutes, together with the inappropriateness of judicial review of questions of fact, militate against assuming an expanded scope of appellate review in unemployment compensation cases involving factual disputes, regardless of whether witnesses have personally appeared before the Industrial Commission. The court therefore declines to independently adopt findings of fact at variance with those of the Industrial Commission where such findings are supported by substantial and

competent evidence in the record. Prior decisions suggesting a contrary result are, to this extent, hereby expressly overruled. *Id.* at 232, 580 P.2d at 78. It is to be *carefully* noted that the *Booth* author suggested to us that *Phipps* was responsible "for this expanded scope of appellate review." Not so at all. *Phipps* itself teaches otherwise:

Beginning with *Roby v. Roby*, 10 Ida. 139, 77 Pac. 213, this court held and has consistently adhered to the holding that:

"Since the trial judge did not see the witnesses upon the stand [the case having been referred to a referee to take testimony and report it to the court] and did not hear them testify but determined the case on depositions, we are in as favorable a position to judge of their truthfulness and the weight to be given to the evidence as was the trial judge. In such case the rule that this court will not disturb the judgment where there is a conflict in the evidence does not apply." See, also, *Stoneburner v. Stoneburner*, 11 Idaho 603, 83 P. 938; *Spofford v. Spofford*, 18 Ida. 115, 108 Pac. 1054; *Parsons v. Wrble*, 19 Ida. 619, 115 Pac. 8, 13; *Jackson v. Cowan*, 33 Ida. 525, 196 Pac. 216; *McKenzie v. Miller*, 35 Ida. 354, 206 Pac. 505; *In re Rexburg Investment Co.*, 36 Ida. 552, 211 Pac. 552; *Estate of Peterson*, 38 Ida. 195, 220 Pac. 1086; *Estate of Tormey*, 44 Ida. 299, 256 Pac. 535; *Pioneer Irr. Dist. v. American Ditch Assn.*, 50 Ida. 732, 1 Pac. (2d) 196; *Keyes v. Keyes*, 51 Ida. 670, 9 Pac. (2d) 804; *Cannon v. Seyboldt*, 55 Ida. 796, 48 Pac. (2d) 406, all decided prior to the adoption of the constitutional amendment, *supra*. *Phipps, supra*, 61 Idaho at 747, 107 P.2d at 150.

*Phipps* fell by inadvertence more than anything else. The real holding of the *Phipps* Court was not to expand the scope of this Court's review on a cold record— *but to continue it* in light of the 1935 amendment to art. 5, § 9 of the Idaho Constitution. The basis for the decision to continue it was clearly set out in *Phipps*, and in language familiar to this court even

as presently constituted: "We must presume the [1935] amendment contemplated the law as it had been announced by this Court." *Phipps, supra*, 61 Idaho at 747, 107 P.2d at 151.

In my view, the *Phipps* holding was sound and ought to be followed. This Court is just as well situated to evaluate a cold record as was the Commission, and perhaps better, if sheer numbers are deemed to be of any consequence. Indeed, it should be the obligation of this Court to independently review the record in order to fulfill the obligations we are compensated to perform.

II.

This case provides a prototypical example of the need to undertake such a review. The record reveals this not to be merely a case where, as the majority would see it, two doctors gave conflicting testimony. There is much more, and that additional evidence tips the issue in favor of Sweeney.

First of all, there is the evidence afforded by the *third* and original treating physician in this scenario, Dr. Johnson. He suggested to the surety that the dispute between Wilson and O'Brien be resolved in favor of O'Brien:

I have reviewed Dr. O'Brien's letter and Dr. Wilson's note. To answer your question if this is an aggravation and would it prevent him from returning to driving truck, I would suggest that those questions be posed to the physicians taking care of him at this time *particularly Dr. O'Brien. The decision whether this is a new injury or an aggravation of a preexisting condition should be determined by Dr. O'Brien.* On his ability to return to truck driving I think this has been well stated in Dr. O'Brien's letter. R., Defendant's Ex. 16 (emphasis added).

Second, Dr. Wilson's testimony was somewhat less than unequivocal. When asked whether Sweeney's complaints during the examination of April 25, 1984 were different from those of December of 1983, Dr. Wilson replied:

A. Probably those complaints are similar. They stress some different things in April as compared to December, namely, he wasn't so much, in December, talking about anterior forearm or anticubitial fausa discomfort, but more was referring to the pain of the back of his elbow. Whether those represent significant changes in the symptom complex, it is a little difficult to be certain. Wilson's Affidavit, p. 9.

In other words, perhaps they were similar; perhaps they were not; it's hard to say. When asked about the tingling in the tip of Sweeney's left little finger, Dr. Wilson said, "That, as a solitary complaint, is difficult to be absolutely sure about." Most importantly, when asked point blank whether Sweeney's symptoms in April 1984 were tied to the industrial accidents of 1983, Dr. Wilson pondered:

A. It's quite difficult for—by history and observation of previous physicians, mainly Doctor Johnson who referred him to me for evaluation and my observations and testing and examination. The patient had sustained a contusion of the elbow which, like other soft tissue injuries, should have recovered and improved before December of 1983.

Q. What explanation can you give, then, Doctor, for the recurrence of symptoms approximately February of 1984, about which you were advised by the patient toward the latter part of April, 1984?

A. *I would assume* that some other type of activity or injury or aggravating factor must have supervened to produce the worsening of his symptoms. *Id.* at 14–15 (emphasis added).

Later, at different moments during cross-examination, Dr. Wilson testified:

Q. Doctor, I would like you to assume something: I would like you to assume, if you can for a moment, that Mr. Sweeney did not suffer the industrial injuries of June and July of 1983, which have been testified about in this proceeding; assuming that those did not occur, would Mr. Sweeney have suffered from the symptoms that he complains about now in his left arm with the type of activities that you have described?

A. There's no reason to think that he would.

. . . .

Q. Do you believe that there's any relationship between the industrial accidents of the summer of 1983 and the problems about which Mr. Sweeney complains about at this time.

A. *Certainly the symptoms were initiated, precipitated or initially precipitated and caused by the accident. I don't think there's any question about that.* The problem then becomes when a patient has continued symptoms *over and beyond the normal recovery period* for that condition, then, what is the explanation for the continued symptoms.

Q. Is it fair to say, then, that you believe the original problem has been aggravated by the additional activity in which Mr. Sweeney has been involved?

A. That would be one factor that might contribute to slow recovery.

. . . .

Q. But for those accidents of June and July, 1983, would he now be suffering from the problems he has in the left arm?

A. Again, that's a difficult question to answer because we are talking about symptoms, a causative factor that seems to be, at least, one order of magnitude removed at this point in time from the patient's symptoms in terms of the character and persistence and nature of his present symptoms and the nature of the previous accidents.

Q. But you have already stated; have you not, that a prolonged recovery period such as these, while not unusual, you have observed?

A. I would qualify that in a sense to say prolonged recover periods do occur and recovery periods of the duration that we are talking about here, namely from June 16 or July of 1983, up through the present time, if the patient is not better, is longer than you are willing to accept

as being on the basis of an elbow contusion without supervening factors. So, in that sense, I would say that his present pain is, at best, indirectly related to the initial injury or injuries of June or July. Whether—to answer the question, whether would have elbow pain or arm pain now if it had not been for that accident, it is a much more difficult one to answer, really, honestly. *Id.* at 17, 23–26 (emphasis added).

In sum, to the critical question involved in this case—whether Sweeney's latest injury to his elbow was related to the earlier on-the-job injuries to the same elbow, Dr. Wilson answered that there was a relationship, but that the extent of the relationship was difficult to determine.

In addition to the tentative nature of his testimony, there is a reason to question Dr. Wilson's testimony. After his initial treatments, Dr. Wilson had released Sweeney to full activity without restrictions, effective December 23, 1983. Affidavit of Wilson, pp. 21 and 26. Dr. Wilson testified that this included cutting wood. *Id.* at 26. For Dr. Wilson to now admit that such activity would aggravate the earlier injuries would be to admit that his release was in error. Dr. Wilson had reason to find a supervening cause.

Dr. O'Brien, in contrast, repeatedly stated his opinion with less equivocation. He informed the insurance company: "I do not believe the exacerbation that we are seeing can be shown to be a new incident. Rather, I would think it is a continuation of the previous one." R., Claimant's Ex. 10. When asked if Sweeney's complaints of 1984 were consistent with his history of injuries from 1983, Dr. O'Brien said, "Yes, they were." O'Brien's affidavit, p. 8. He further was questioned and testified:

Q. Would he [Sweeney] have the present problems that he does have but for the accident in the summer of 1983?

A. Not reasonably so.

q. Doctor, based upon a reasonable degree of medical probability do you have an opinion as to whether Mr. Sweeney's present condition is a result of a new accident or injury, or whether it is the result of an aggravation or an exacerbation of the injuries of the summer of 1983?

A. I have an opinion.

Q. What is that opinion?

A. I would feel that it's an exacerbation of the previous injury.

Under cross-examination, Dr. O'Brien was asked and replied as follows:

Q. Whether you can say that the medical requirement that he not work at this time should be caused by, or related to, the original industrial accident.

A. Well, it's my contention—It is my contention that that is what it's related to. *Id.* at 21.

Dr. O'Brien's strong testimony, coupled with the support of Dr. Johnson and the uncertainty of Dr. Wilson, persuades me that the Commission erred in its finding that Sweeney had failed to establish a causal connection between the 1984 injury and the on-the-job injuries to the same elbow which occurred only some six to seven months earlier.

How the majority would resolve the conflict between the doctors, were it to deign to do so, is uncertain. One thing is certain, however; so long as this Court labors under the erroneously decided *Booth* decision, more wrongly determined claims—whether determined for or against the claimant—will be affirmed so long as substantial competent evidence sustains the findings—which to my mind will not be in the least disconcerting—provided, however, that the Commission has more before it than the same cold record which we also review.

In short, I submit that prior to 1979 this Court could and functionally was obliged to review a cold record just as the Commission has done, and five of us should collectively and collegially determine the outcome from the evidence—being in no way obliged to affirm the Commission's findings made from that same cold record. Far better for the parties involved that the litigation be brought to an end, now, and at this level. All that is necessary is that five

shoulders be put to the wheel, as it was ever so in former times until 1979.